**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
        *Plaintiff-Appellee,*

v.

SCOTT RAYMOND SHETLER,
        *Defendant-Appellant.*

No. 10-50478

D.C. No.
2:09-cr-01126-
RGK-1

OPINION

Appeal from the United States District Court
for the Central District of California
R. Gary Klausner, District Judge, Presiding

Argued and Submitted
August 3, 2011—Pasadena, California

Filed December 28, 2011

Before: Stephen Reinhardt and Marsha S. Berzon,
Circuit Judges, and Matthew F. Kennelly, District Judge.*

Opinion by Judge Reinhardt

*The Honorable Matthew F. Kennelly, District Judge for the U.S. District Court for Northern Illinois, sitting by designation.

## COUNSEL

Victor R. Cannon, Glendale, California; Liliana Coronado, Federal Defender, Los Angeles, California; Ashwini Shrikrishna Mate, Assistant Federal Defender, Los Angeles, California, for the defendant-appellant.

Michael J. Raphael, Assistant U.S. Attorney, Los Angeles, California; Jerry Chenwei Yang, Assistant U.S. Attorney, Los Angeles, California, for the plaintiff-appellee.

**OPINION**

REINHARDT, Circuit Judge:

Scott Raymond Shetler ("Shetler") appeals from his conviction for maintaining his residence "for the purpose of manufacturing, distributing, or using" methamphetamine in violation of 21 U.S.C. § 856(a)(1). Shetler contends that the district court erred in denying his motion to suppress certain inculpatory statements he made to Drug Enforcement Agency (DEA) officials. Because the government did not bear its burden of showing that these statements were not the product of government officials' concededly illegal searches of Shetler's home and garage, we reverse his conviction. Shetler further contends that there was insufficient evidence to support his conviction, and that the statute is void for vagueness as applied to him. We conclude that, although the evidence was sparse, it was sufficient to allow a jury to infer that one of the primary or principal uses to which Shetler devoted his property was the manufacture, distribution, or use of methamphetamine. We therefore hold that he is not entitled to a judgment of acquittal on the ground of insufficient evidence. We also reject his void for vagueness argument.

**I.**

*1.  Factual Background*

At 7:40 p.m on September 22, 2009, an anonymous tipster later revealed to be Jamie Shetler ("Jamie") called the Pomona Police Department to report that her father, Shetler, was manufacturing and using methamphetamine in his home in Pomona, California. Three police officers arrived at Shetler's home shortly after 8 p.m. Shetler's house has an attached garage. As the officers approached Shetler's house, they noticed that the door to the garage was open, and one officer smelled a chemical odor associated with possible methamphetamine production emanating from within. The

officers observed that the garage was full of boxes, motorcycle parts, and other equipment. They also saw a partition wall that concealed the back portion of the garage from their view.

The officers entered the garage and conducted a visual sweep to determine if there was an in-operation methamphetamine lab or a person behind the partition wall. They did not find anyone inside the garage or any evidence that methamphetamine was then being cooked. The officers did, however, observe the following items in plain view behind the partition wall: a can of acetone, a duffel bag containing several plastic and glass beakers, and a jug that appeared to contain red phosphorus, a chemical that the officers knew to be related to the production of methamphetamine.

At approximately 8:15 p.m., the officers left the garage and knocked on the front door of the house. Shetler exited the house from a side door and approached the officers, who handcuffed and detained him. By this point, several additional police officers had arrived. The police then called into the house to Shetler's girlfriend, Cynthia Marohn, and her daughter, both of whom lived with Shetler. Marohn and her daughter stepped outside, and several officers immediately entered the residence and conducted a sweep. After completing this search of the house, several officers stayed inside the house, near the front door and in view of Marohn, who remained outside. At 8:45 p.m., while these officers were still inside the residence, Marohn signed a consent form that authorized the police to enter the premises and search for "methamphetamine, methamphetamine cooking and packaging material, [and] weapons."

The police then began to search Shetler's home and garage. By 9 p.m., DEA agents had arrived. They put on protective suits and masks and performed a more thorough search of Shetler's garage than the police had previously conducted. By midnight, they had uncovered a number of items associated with methamphetamine production, including acetone, iodine

and iodine pellets, hydriatic acid, muriatic acid, Drano, Heet, flasks with residue, empty bottles of lighter fluid, a water bottle with white residue, a yellow bi-layered liquid, a red powder they suspected to be ground up pseudoephedrine, and a hot plate. Inside the house, the police recovered a number of firearms, along with additional items consistent with methamphetamine use.

During this entire period, Shetler was detained outside of his house in view of the extensive ongoing searches. At 1:30 a.m. on September 23rd, a DEA agent read Shetler his *Miranda* rights. Shetler then confessed to the agent that he had been manufacturing methamphetamine in a laboratory in his garage.

Shetler was taken to the Pomona Police Department, where he was held until September 24th. At 10 a.m. that morning, a DEA agent took custody of Shetler. After reading him his *Miranda* rights, the agent drove him to his home and interrogated him regarding an additional firearm that he suspected had not yet been recovered. Shetler told the agent that he had a handgun hidden in a tool box in the back of his garage, and signed a consent form to allow the agent to enter the garage and recover the gun. The agent then transported Shetler to a DEA field office.

At 1 p.m., Shetler was again read his *Miranda* rights. Four DEA agents, including Agent Bradley Clemmer, then interviewed him. During this interview, Shetler made multiple statements regarding his methamphetamine use and production, along with statements regarding the firearms and ammunition in his possession. Shetler had not, at the time he gave these statements, had any contact with a lawyer, and had been continuously in detention since the time of his arrest.

## 2.   *Procedural History*

Shetler was charged with maintaining drug-involved premises in violation of 21 U.S.C. § 856(a)(1) and knowingly pos-

sessing a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A)(i). Prior to trial, he moved to suppress all evidence obtained during the warrantless searches of his house and garage on the night of his arrest, the additional handgun found on September 24th, and all statements he had made on the night of his arrest and during his interview at the DEA office.

After conducting two separate evidentiary hearings, the district court held that the initial warrantless sweep of the garage had been justified under the exigent circumstances, emergency, and protective sweep exceptions to the Fourth Amendment, and that the evidence observed during that sweep — the can of acetone, the duffel bag containing several beakers, and the jug of red phosphorus — need not be suppressed. It found, however, that the initial warrantless sweep of the house could not be justified under any of the exceptions applicable to the initial search of the garage, and was therefore illegal. The court further found that Marohn's consent to any further searches was tainted because the police sought her consent while officers remained physically inside the house after having already illegally searched it. All subsequent searches on the night of the 22nd were therefore deemed to be illegal, and all evidence obtained during the course of those searches was suppressed. Also suppressed as the fruit of those illegal searches was the additional firearm recovered by the DEA agent on the morning of the 24th, along with any statements Shetler had made relating to his possession of firearms.[1] The district court denied, however, Shetler's motion to suppress the statements relating to his methamphetamine use and manufacture he had made to DEA agents on the night of his arrest and during the interview at the DEA office. It held that those statements need not be suppressed because they were "sufficiently the product of the initial legal search of the garage, and the Defendant's lawful arrest for methamphetamine man-

---

[1]The district court subsequently dismissed the gun possession charge on the government's motion at trial.

ufacture thereon, and were not tainted by the illegal searches of the garage."

At trial, the government introduced, through the testimony of Agent Clemmer, the statements Shetler had made at the DEA office. Clemmer testified that Shetler had admitted to manufacturing methamphetamine using a recipe he had obtained on the internet. He described the procedure of cooking and mixing the various chemicals that Shetler claimed to use, as well as how Shetler would go to multiple small pharmacies that would not require him to show identification in order to attain pseudoephedrine, a necessary component of methamphetamine. Clemmer also testified that Shetler had admitted that both he and Marohn consumed the methamphetamine he manufactured, that he would use the drug five times a week, two to three times a day, and that he had begun to use it in 1989. Clemmer could not recall the exact date that Shetler claimed to have begun manufacturing methamphetamine, but Clemmer believed he had said that it was five years before his arrest.

The government presented three witnesses in addition to Agent Clemmer. The first, Pomona police officer James Suess, described the police's initial search of Shetler's garage and the items they had observed behind the partition wall. The second, DEA Chemist Helene Jennsen, described the process of manufacturing methamphetamine, and testified that she had tested two of the chemicals found in Shetler's garage and determined them to be chemicals often used in this process.

The final government witness was Shetler's daughter, Jamie. Jamie, who had lived in her father's house "off and on" during the prior four years, testified that: (1) Shetler spent a great deal of his time in the partitioned area of the garage; (2) while "snoop[ing] around" in that area, she had seen beakers containing fluids, a hot plate, and funnels; (3) she had on a number of occasions smelled a strong chemical odor emanating from the garage; (4) she had found a recipe for making

methamphetamine on her father's computer, witnessed him take a large box of matches and remove all the tips, and had heard him describe going to different stores in different cities in order to buy Sudafed (which contains pseudoephedrine); (5) she had seen pipes in the amoire in Shetler's bedroom, and had often heard the flick of a cigarette lighter and coughing when Marohn and Shetler were in that room; and (6) "often-times" Shetler would host people in the garage; she described one night in particular on which there had been a number of cars parked in the driveway, the doors to the garage were shut, and it "sounded like a party was going on" inside.

At the close of trial, Shetler made a motion for acquittal, contending that there was insufficient evidence to sustain his conviction under 21 U.S.C. § 856 (a)(1), and that the statute would be void for vagueness if applied to him. The district court denied the motion. After the jury returned a guilty verdict, Shetler made a motion for new trial or acquittal, renewing his objections that there was insufficient evidence to sustain his conviction and that the statute as applied to him was void for vagueness. The district court denied this motion as well. Shetler now appeals.

## II.

Shetler argues, first, that the district court erred in denying his motion to suppress the statements regarding his drug activities that he made to a DEA agent on the night of his arrest outside his home and those he made during his interview at the DEA office 36 hours after his arrest.[2] We review de novo the district court's denial of Shetler's motion to sup-

---

[2]Although the district court did not suppress either set of statements, the Government introduced at trial only those statements that Shetler made at the DEA office, not those he made while outside his home on the night of the arrest. We consider, therefore, only whether the district court erred in failing to suppress this former set of statements, as any error with respect to the latter was harmless beyond a reasonable doubt. *See United States v. Bishop*, 264 F.3d 919, 927 (9th Cir. 2001).

press these statements, and review factual findings underlying the denial of the motion for clear error. *United States v. Bynum*, 362 F.3d 574, 578 (9th Cir. 2004).

**[1]** The exclusionary rule bars the prosecution from using at trial evidence that has been obtained through a violation of the Fourth Amendment. *Wong Sun v. United States*, 371 U.S. 471, 484-85 (1963). Although exclusion is not itself a personal constitutional right, it serves to enforce the underlying personal right to be free from unreasonable searches and seizures by deterring violations of the Fourth Amendment. *See Davis v. United States*, 131 S.Ct. 2419, 2426 (2011). The exclusionary rule applies both to direct products of an illegal search—i.e., the physical evidence found during the search itself—and to indirect products of the illegal search—i.e., statements or physical evidence subsequently obtained in part as a result of the search—if they "bear a sufficiently close relationship to the underlying illegality." *United States v. Ladum*, 141 F.3d 1328, 1336-37 (9th Cir. 1998); *see also Wong Sun*, 371 U.S. at 485; *United States v. Rodgers*, 656 F.3d 1023, 1031 (9th Cir. 2011); *United States v. Crawford*, 372 F.3d 1048, 1054 (9th Cir. 2004) (en banc) ("It is well established that the Fourth Amendment's exclusionary rule applies to statements and evidence obtained as a product of illegal searches and seizures.").

**[2]** Neither party before this Court challenges the district court's determinations that the initial search of Shetler's garage was legal, but that all subsequent searches of Shetler's home and garage—conducted without a warrant, without valid consent, and without any justificatory extenuating circumstances—were illegal. The question, then, is whether the district court erred in finding that the statements made by Shetler at the DEA office were not sufficiently connected to the preceding illegal searches to constitute "fruit of the poisonous tree." We first ask whether the statements were the product of the illegal searches; if they were, we then ask whether they were nevertheless so attenuated from the

searches that suppression was not warranted. *See New York v. Harris,* 495 U.S. 14, 19 (1990); *Brown v. Illinois*, 422 U.S. 590, 598-99 (1975). In doing so, we require the government to show that the statements were not obtained illegally. *United States v. Patzer*, 277 F.3d 1080, 1086 (9th Cir. 2002). "It is the government's burden to show that evidence is not 'fruit of the poisonous tree.' " *Id.* (quoting *United States v. Twilley*, 222 F.3d 1092, 1097 (9th Cir. 2000)); *see Brown*, 422 U.S. at 604.

The government did not bear its burden of showing that Shetler's statements were not the product of the illegal searches. Contrary to the district court's determination, there is no evidence in the record to support the conclusion that the statements were "the product of the initial legal search of the garage, . . . and were not tainted by the illegal searches of the garage." Both the district court and the government appear to presume that the relevant inquiry is whether the agents could have questioned Shetler regarding his drug activities but for the illegal search. The logic underlying this position is as follows: because the government had probable cause, regardless of any evidence revealed during the illegal searches of his house and garage, to arrest and question Shetler as to whether he used or manufactured methamphetamine, the statements he made during that questioning cannot be considered the product of the illegal searches.

**[3]** Although the presence of probable cause may generally be the "dispositive" issue in determining whether a confession stemming from an illegal *detention* should be suppressed, *see Crawford* 372 F.3d at 1056, "[t]he analysis that applies to illegal detentions differs from that applied to illegal searches," *id.* at 1054 (citing 5 Wayne R. LaFave, Search and Seizure 273, § 11.4(c) (3d ed. 1996)). As Shetler's case illustrates, there are at least two additional relevant considerations when a confession follows an illegal search rather than an illegal detention.

**[4]** The first additional consideration in an illegal search case is that the interrogating officers may confront the suspect, either physically or verbally, with the evidence that has been illegally obtained. *See Ruiz v. Craven*, 425 F.2d 235 (9th Cir. 1970). *Compare with Crawford* 372 F.3d at 1058 (holding that the "necessary connection" between the illegal search at issue and the defendant's later confession was missing in part because the search "produced no evidence whatsoever"). The government has not brought forth evidence to refute the likelihood that the DEA agents, in eliciting statements from Shetler when questioning him regarding his drug use and manufacture, utilized the extensive evidence illegally seized from Shetler's home and garage. A question such as "did you manufacture methamphetamine in your garage?" might not confront Shetler with illegally seized evidence; a question such as "did you manufacture methamphetamine using iodine and iodine pellets, hydriatic acid, muriatic acid, Drano, Heet, flasks, empty bottles of lighter fluid, a water bottle with white residue, a yellow bi-layered liquid, ground up psuedoephedrine, and a hot plate, all of which we found in your garage?" certainly would. Although it is possible that the DEA agents who interrogated Shetler restricted themselves to questions of the former variety—using only their general knowledge that Shetler might be manufacturing methamphetamine, together with the acetone, beakers, and jug of red phosphorus seen in the initial, legal search—as the government conceded at oral argument, there is no evidence in the record that they did not also confront him with the illegally seized evidence in their questioning.[3]

---

[3]The government attempts to analogize this case to *United States v. Green*, 523 F.2d 968 (9th Cir. 1975), in which we held that the defendant's confession was not the product of an illegal search that yielded 400 pounds of marijuana because the defendant had also, prior to making his statements, been confronted with 880 pounds of marijuana recovered during a lawful search. *Id.* at 972. Although we concluded in *Green* that "the role of the suppressed evidence in producing [the defendant's confession] must be considered de minimis" in light of the substantial additional physical evidence with which Green was confronted, *id.*, here the physical evidence obtained in the illegal search was significantly greater and more inculpatory than the three items observed during the initial legal sweep of Shetler's garage.

**[5]** A second, related, consideration in an illegal search case such as this is that the answers the suspect gives to officials questioning him may be influenced by his knowledge that the officials had already seized certain evidence. "Confronting a suspect with illegally seized evidence tends to induce a confession by demonstrating the futility of remaining silent." 6 Wayne R. LaFave, Search and Seizure 307, § 11.4(c) (4th ed. 2004) (quoting *People v. Robbins*, 369 N.E.2d 577, 581 (Ill. App. Ct. 1977)). The government has produced no evidence to demonstrate that the answers Shetler gave to the government officials' questions were not induced or influenced by the illegal search; indeed, there is every reason to believe that they were. Nothing in the record suggests that Shetler was aware of the initial, legal search of his garage: he came out of a side door of his house shortly after the officers had already completed their initial sweep. There is, on the other hand, irrefutable evidence that while detained outside his home for more than five hours he witnessed multiple illegal searches of his house and garage, including a set of lengthy searches, using protective clothing and masks, of the garage which he knew contained extensive materials associated with methamphetamine production. Witnessing government officials conduct these extensive searches that uncovered numerous items indicative of methamphetamine production could certainly have led Shetler to make the inculpatory statements he made to the DEA agents. Contrary to the district court's holding, therefore, these statements cannot be said to be simply the product of the initial legal search (of which Shetler was likely unaware) rather than the extensive subsequent illegal searches (of which Shetler was undoubtedly acutely aware).

**[6]** Nor has the government borne its burden of showing that, if Shetler's statements were the product of the illegal searches of his home and garage, they were nevertheless sufficiently attenuated from the government's illegal conduct so as not to warrant suppression. "Challenged evidence is not considered the fruit of lawless police conduct when the connec-

tion between the illegality and the evidence becomes 'so attenuated as to dissipate the taint.' " *United States v. $186,416.00 in United States Currency*, 590 F.3d 942, 951 (9th Cir. 2010) (quoting *Wong Sun*, 371 U.S. at 491). Three factors are relevant in determining whether Shetler's statements were sufficiently attenuated from the underlying illegality to be admissible: (1) the temporal proximity of the search to the confession; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct. *Id.* (citing *Brown*, 422 U.S. at 603-04).

**[7]** Although the 36 hours that passed between the illegal search and Shetler's confession at the DEA office is a relatively long time, the temporal proximity factor does not weigh in the government's favor. The relevant question for attenuation purposes is whether this passage of time would have in any way dissipated Shetler's perception that the searches had produced evidence such that his remaining silent would be useless, or decreased the extent to which the government's confronting Shetler with the illegally seized evidence induced his statements. "[T]o draw any conclusions from [the] timing of [the defendant's] confessions, we must consider the temporal proximity factor in conjunction with the presence of intervening circumstances." *United States v. Reed*, 349 F.3d 457, 464 (7th Cir. 2003). For this reason, there is "no 'bright-line' test for temporal proximity in an attenuation analysis." *$186,416.00 in U.S. Currency*, 590 F.3d at 951 (holding that a two month gap between an illegal search and a defendant's subsequent declaration was not sufficient to render the declaration attenuated from the search); *see also* 6 Wayne R. LaFave, Search and Seizure 307, § 11.4(c) (4th ed. 2004) (observing that "the *Brown* 'temporal proximity' factor is of virtually no significance" when evaluating a confession that followed an illegal search). Here, there is no reason to think that the passage of 36 hours would have weakened the causal connection between the illegal searches and Shetler's statements, particularly because the DEA agents may have con-

fronted Shetler with illegally seized evidence during the interview in which he made those statements.

[8] There are likewise no intervening circumstances that break the causal chain between the searches and the confession. Shetler spent the intervening period in detention, and did not speak to a lawyer. Although Shetler did receive *Miranda* warnings on at least three occasions after the illegal searches and before his confession in the DEA office, such warnings are insufficient to "purge the taint of a temporally proximate prior illegal" act. *United States v. Washington*, 387 F.3d 1060, 1075 (9th Cir. 2004). As the Supreme Court declared in *Brown*, "Any incentive to avoid Fourth Amendment violations would be eviscerated by making [*Miranda*] warnings, in effect, a 'cure-all,' and the constitutional guarantee against unlawful searches and seizures could be said to be reduced to 'a form of words.' " 422 U.S. at 602-03 (quoting *Mapp v. Ohio*, 367 U.S. 643, 648 (1961)).[4]

---

[4]In contrast, in the absence of a deliberate law enforcement decision to conduct an un-*Mirandized* interrogation in advance of one with *Miranda* warnings, *see Missouri v. Seibert*, 542 U.S. 600, 620-22 (2004) (Kennedy, J., concurring), a "careful and thorough administration of *Miranda* warnings serves to cure" a confession that would otherwise be inadmissible based on a theory that it was induced by a prior confession made in the absence of *Miranda* warnings. *Oregon v. Elstad*, 470 U.S. 298, 310-11 (1985). That is because obtaining a confession without *Miranda* warnings is not in itself unconstitutional, *see Chavez v. Martinez*, 538 U.S. 760, 766-67 (2003); only use of the confession during criminal proceedings violates the Fifth Amendment, *see Stoot v. City of Everett*, 582 F.3d 901, 923-25 (9th Cir. 2009). So, in the double-confession context, the question is the voluntariness of the second confession in light of the first, not the "taint" from prior illegal conduct. *Seibert* and *Elstad* do not govern Shetler's claim, which is that his confession was "directly or indirectly attributable to [a Fourth Amendment] violation," *Crawford*, 372 F.3d at 1058, not that his confession was coerced by his having previously made an un-*Mirandized* confession. *See Elstad*, 470 U.S. at 306 ("Where a Fourth Amendment violation 'taints' the confession, a finding of voluntariness for the purposes of the Fifth Amendment is merely a threshold requirement in determining whether the confession may be admitted in evidence.").

**[9]** Finally, the government has not shown that the third attenuation factor, the purpose and flagrancy of the illegal search, weighs against suppression of Shetler's statements. A statement is more likely to be tainted if there is evidence that the illegal conduct that preceded it involved "either purposeful extraction of evidence or flagrant illegality." *Washington*, 387 F.3d at 1075 n.17. Although the government argued before the district court that the initial warrantless search of the house was done as part of a protective sweep, the district court rejected this claim because there was no plausible threat emanating from the house. More important, the police never left the house after performing this search, staying in a room near the entryway for approximately 25 minutes. That they did so before asking for Marohn's consent to enter and search the house, and that some officers remained inside the house while others obtained her (tainted) consent, constituted flagrant misconduct. *See Washington*, 387 F.3d at 1076 (finding it "difficult to conclude that the officers acted in good faith" when they had asked for consent after they already unconstitutionally entered the defendant's room). Moreover, the purpose of the subsequent illegal searches was indisputably to find evidence that could be used against Shetler. The evidence found during these searches was, of course, the very same evidence we have determined to be causally connected to Shetler's statements. "Because this unbroken 'causal chain' links the initial illegality and [Shetler's] subsequent statement[s], the [statements are] not 'sufficiently an act of free will to purge the primary taint' from the [officials'] unlawful actions." *$186,416.00 in U.S. Currency*, 590 F.3d at 953 (quoting *Brown*, 422 U.S. at 602).

**[10]** We hold that the government did not bear its burden of proving that Shetler's statements to DEA officials were not the product of the illegal searches of his home and garage, and that the district court therefore erred in denying Shetler's motion to suppress these statements. The government does not contend that the admission of the statements at trial through the testimony of Agent Clemmer was harmless

beyond a reasonable doubt. *See Bishop*, 264 F.3d at 927. Nor could it, as Shetler's confession was central to the prosecution's case.[5] Accordingly, Shetler's conviction must be reversed.

## III.

We now consider Shetler's claims that, if successful, would entitle him to a judgment of acquittal. *See United States v. Williams*, 547 F.3d 1187, 1195 (9th Cir. 2008).[6] Shetler challenges the sufficiency of the evidence to sustain his conviction under 21 U.S.C. § 856(a)(1), and argues that the statute is unconstitutionally vague as applied to his residential drug activities. Both claims require an examination of the scope of § 856(a)(1).

### 1.   21 U.S.C. § 856(a)(1)

[11]  Under § 856(a)(1), which is also known as the federal "crack-house" statute, *see United States v. Verners*, 53 F.3d 291, 293 (10th Cir. 1995), it is unlawful to:

> knowingly open, lease, rent, use, or maintain any place, whether permanently or temporarily, for the purpose of manufacturing, distributing, or using any controlled substance.

21 U.S.C. § 856(a)(1).

Shetler's challenge to his conviction turns in large part on the meaning of the phrase "for the purpose of" in § 856(a)(1). Although some circuits have attempted to define the requisite

---

[5]As the prosecutor emphasized in his closing argument, "[M]ost importantly, ladies and gentlemen, the defendant confessed. He confessed."

[6]Because we hold that the failure to suppress Shetler's confession in the DEA office was reversible error, we need not reach Shetler's claim that aspects of the jury instructions given by the district court were erroneous.

type and degree of purpose connecting a defendant's use of property and his drug activities under § 856(a)(1), we have not yet directly confronted the issue. Courts to consider the question have agreed that § 856(a)(1) does not apply to occasional drug use in one's own home. As the D.C. Circuit has held, "The 'casual' drug user does not run afoul of [§ 856(a)(1)] because he does not maintain his house for the purpose of using drugs but rather for the purpose of residence, the consumption of drugs therein being merely incidental to that purpose." *United States v. Lancaster*, 968 F.2d 1250, 1253 (D.C. Cir. 1992); *accord United States v. Russell*, 595 F.3d 633, 642-43 (6th Cir. 2010); *Verners*, 53 F.3d at 296. There is also a consensus that to secure a conviction under the statute the government need not show that the drug activities were the *sole* purpose of the defendant's use of the property. The Fifth, Sixth, Seventh and Tenth Circuits have all so held. *United States v. Roberts*, 913 F.2d 211, 220 (5th Cir. 1990), *cert denied sub nom. Preston v. United States*, 500 U.S. 955 (1991); *Russell*, 595 F.3d at 642-43; *United States v. Church*, 970 F.2d 401, 406 (7th Cir. 1992); *Verners*, 53 F.3d at 296; *see also Moore v. United States*, 927 A.2d 1040, 1053 (D.C. 2007) (interpreting parallel provision of the D.C. code). As the Fifth Circuit observed, "Had Congress intended convictions under [§ 856(a)(1)] to be limited to those who open or maintain facilities having [drug] manufacturing as their sole purpose, it would have said so." *Roberts*, 913 F.2d at 220. In attempting to delineate where between the poles of "incidental use" and "sole purpose" lies the degree of "purpose" necessary for the drug-based use of a property to constitute a violation of § 856(a)(1), courts have employed various formulations, ranging from a requirement that the drug activities constitute "a significant purpose" of the property's use, *United States v. Soto-Silva*, 129 F.3d 340, 346 n.4 (5th Cir. 1997), to a requirement that they constitute "one of the primary or principal uses" of the property, *Verners*, 53 F.3d at 296.

[12] To the extent that there is a meaningful difference between these various formulations, we agree with the Tenth

Circuit that "in the residential context, the manufacture (or distribution or use) of drugs must be at least one of the primary or principal uses to which the house is put." *Id.* Restricting the application of § 856(a)(1) to those individuals whose manufacture, distribution, or use of drugs in their residence constitutes "one of the primary or principle" purposes of their occupancy of that residence ensures that the statute does not extend beyond its intended coverage so as to encompass "incidental" drug use, *see Lancaster*, 968 F.2d at 1253, a slippage that might occur were only "a *significant* purpose" required. This formulation also better comports with the statutory language, which proscribes only those drug activities that are "*the* purpose" to which the property is put. § 856(a)(1) (emphasis added). Moreover, the construction of § 856(a)(1) we adopt ensures that the statute is not unconstitutionally vague. *See infra* section III.3; *Skilling v. United States*, 130 S.Ct. 2896, 2929 (2010) ("It has long been [our] practice . . . before striking a federal statute as impermissibly vague, to consider whether the prescription is amenable to a limiting construction.").

**[13]** Shetler contends that § 856(a)(1) should be interpreted to apply only to those who use their property for *commercial* drug activities. Although his argument is not unreasonable, we do not read the statute so narrowly. Nothing in the text of the statute limits its application to commercial drug sales. Nor does the statute's place within the federal drug laws provide support for Shetler's construction. Although Shetler is correct that other statutes already criminalize possession and manufacture of a controlled substance, a commercial purpose requirement is not necessary to save § 856(a)(1) from redundancy: in contrast to other federal drug laws, § 856(a)(1) is designed to proscribe particular "use[s] of *property*" to further drug activities. *United States v. Stumoski*, 971 F.2d 452, 461-62 (10th Cir. 1992) (emphasis added). Moreover, none of the other circuits has held that the statute proscribes only commercial drug activities. Finally, we have previously upheld convictions under § 856(a)(1) without ref-

erence to whether the drugs manufactured at a property were subsequently sold for profit. *See United States v. Hollis*, 490 F.3d 1149, 1154 (9th Cir. 2007); *United States v. Basinger*, 60 F.3d 1400, 1406 (9th Cir. 1995).

**[14]** That said, Shetler is correct that Congress's primary purpose in enacting § 856(a)(1) was to target those who use their property to profit from drug sales. As then-Senator Joe Biden explained after the enactment of the 2003 amendment to § 856, which he authored, the statute "does not criminalize simple consumption of drugs in one's home." 149 Cong. Rec. S10608 (daily ed. July 31, 2003); *see Lancaster*, 968 F.2d at 1253. Thus, even if it is not a separate element of § 856(a)(1) that a defendant's manufacture, distribution or use of drugs be commercial in nature, convictions under the statute will usually involve some aspect of a commercial drug transaction. As the Tenth Circuit explained,

> [T]he "crack-house" statute was designed to punish those who use their property to run drug businesses — hence, the more characteristics of a business that are present, the more likely it is that the property is being used "for the purpose of" those drug activities prohibited by § 856(a)(1).

*Verners*, 53 F.3d at 296-97. Particularly where the property in question is the defendant's own home—and is devoted principally to the ordinary activities of residential living—evidence beyond drug manufacture for personal use is necessary to sustain a conviction under § 856(a)(1).[7] An individual does not

---

[7]In *United States v. Basinger*, we upheld a defendant's conviction under § 856(a)(1) based on evidence showing that he used a shed located on someone else's property as a clandestine methamphetamine laboratory. 60 F.3d at 1406. There was no contention in that case that the defendant was manufacturing drugs solely for personal use. *See id.* Moreover, when the lab was discovered, Basinger, who had parked his trailer on the property with the owner's permission for approximately a month, no longer maintained it there; thus, there was no competing residential use that the jury could conclude rendered his drug activities anything other than his primary or principle use of the property. *Id.* at 1404.

employ his property for a "primary or principal" use of drug activity where he merely grows or manufactures drugs in his own home for his own consumption (and for those who share his residence and its residential purposes). In sum, although the evidence necessary for conviction will therefore generally involve actual commercial drug transactions, it may in some circumstances be possible for a jury to infer that a defendant's drug activities were a "primary or principal use" of the property where, even if he does not profit financially from such activity, there is evidence that drug activity involving consumption or use by numbers of non-resident individuals occurs in the home.

## 2. Sufficiency of the Evidence

We review de novo Shetler's appeal from the district court's denial of his motion for acquittal. *United States v. Sullivan*, 522 F.3d 967, 974 (9th Cir. 2008). We engage in a two-step process when considering a defendant's challenge to the sufficiency of the evidence: we first construe the evidence "in the light most favorable to the prosecution," and we then determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Nevils*, 598 F.3d 1158, 1161 (9th Cir. 2010) (quoting *Jackson v. Virginia,* 443 U.S. 307, 319 (1979)) (internal quotation marks omitted). Evidence is insufficient to sustain a conviction when, viewed in the light most favorable to the prosecution, it is "so supportive of innocence that no rational juror could conclude that the government proved its case beyond a reasonable doubt," or "where mere speculation, rather than reasonable inference, supports the government's case." *Id.* at 1167.

**[15]** Although it is a close question, we conclude that the prosecution presented sufficient evidence to permit the jury to infer that one of the primary or principal uses to which Shetler put his property was the manufacture, distribution or use of methamphetamine for a purpose other than consumption by

himself and those who shared his home. There was undisputed evidence that Shetler regularly manufactured methamphetamine, and that he often hosted gatherings in his garage. Because the gatherings were held in a garage in which methamphetamine was being manufactured, and because the garage was closed during the gatherings, the jury could have inferred that methamphetamine that Shetler manufactured was consumed at the gatherings. *See Cavazos v. Smith*, 181 L. Ed. 2d 311, 316 (2011) (per curiam) ("[A] reviewing court 'faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.' ") (quoting *Jackson,* 443 U.S. at 326). Thus, the evidence was sufficient to allow the jury to find that Shetler's drug activities were not purely personal, but also included the supplying of drugs to persons who did not reside on his property. We therefore reject Shetler's sufficiency of the evidence challenge.

### 3.   Void for Vagueness

Whether a statute is void for vagueness is reviewed de novo. *United States v. Mincoff*, 574 F.3d 1186, 1191-92 (9th Cir. 2009). In an as-applied challenge such as Shetler's, "a statute is void for vagueness (and thus unconstitutional under due process) if the statute '(1) does not define the conduct it prohibits with sufficient definiteness and (2) does not establish minimal guidelines to govern law enforcement.' " *United States v. Wyatt*, 408 F.3d 1257, 1260 (9th Cir. 2005) (quoting *United States v. Rodriguez*, 360 F.3d 949, 953 (9th Cir. 2004)); *see Giaccio v. Pennsylvania*, 382 U.S. 399, 402-03 (1966).

**[16]** Shetler contends that § 856(a)(1) does not "give a person of ordinary intelligence a reasonable opportunity to know" that it would apply to the sort of drug manufacture, distribution, and use in which he engaged. Although he is cor-

rect to point out that the line drawn to determine the boundaries of the statute if construed broadly would be hazy, it is not unconstitutionally vague if narrowly construed. *See Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972) (upholding ordinance "marked by flexibility and reasonable breadth, rather than meticulous specificity") (quotation omitted); *see also Skilling*, 130 S.Ct. at 2929, discussed *supra* at p. 21371. Individuals subject to the statute, and officials enforcing it, have sufficient standards to guide them when § 856(a)(1) is limited in the manner we have explained. As the Eleventh Circuit observed in rejecting a similar void for vagueness challenge to an earlier version of § 856(a)(1), "[t]he presence of the two intent elements, 'knowingly' and 'for the purpose' does much to eliminate the contention of vagueness or unfairness in application." *United States v. Clavis*, 956 F.2d 1079, 1094 (11th Cir. 1992) (citing *Village of Hoffman Estates v. The Flipside*, 455 U.S. 489, 499 (1982)).[8] A defendant who knowingly devotes his property to a primary or principle use of manufacturing, distributing, or using a controlled substance for other than personal consumption has notice that his substantial drug activities fall within § 856(a)(1)'s purview. Similarly, law enforcement officials have sufficient guidance in enforcing the statute if they are constrained by a requirement that only those drug activities that are a "primary or principle use" of a residence, usually commercial activities or at least the activities of individuals who do not reside in the putative

---

[8]At the time *Clavis* was decided, § 856(a)(1) made it illegal to " 'knowingly maintain or open any place for the purpose of manufacturing, distributing, or using any controlled substance.' " 956 F.2d at 1090 (quoting 21 U.S.C. § 856(a)(1)). In 2003, the statute was amended to its present language. Although the "knowingly" and "for the purpose" terms remain, the 2003 amendments broadened the statute to cover not only those who "maintain" or "open" a place, but also those who "lease, rent, or use . . . any place, whether permanently or temporarily." 21 U.S.C. § 856(a)(1) (amended 2003). The amendments increase the possibility that § 856(a)(1) would be unconstitutionally vague if construed expansively. What is meant by "use" of "any place . . . temporarily" is, for example, certainly far from clear.

defendant's home, are proscribed. Accordingly, we hold that § 856(a)(1), as so applied, is not void for vagueness with respect to Shetler.

## IV.

We hold that the district court erred in denying Shetler's motion to suppress the statements he made to DEA agents regarding his drug activities. We affirm, however, the district court's denial of Shetler's motions for acquittal and new trial on the grounds that there was insufficient evidence to sustain his conviction under § 856(a)(1) and that the statute was void for vagueness as applied to him. Accordingly, we reverse Shetler's conviction, and remand for further proceedings consistent with this opinion.

**REVERSED** and **REMANDED**.