**FOR PUBLICATION**

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

NIKOLAY P. BOCHARNIKOV,
*Defendant-Appellant.*

No. 19-30163

D.C. No.
3:18-cr-00159-
BR-1

OPINION

Appeal from the United States District Court
for the District of Oregon
Anna J. Brown, District Judge, Presiding

Argued and Submitted May 14, 2020
Portland, Oregon

Filed July 27, 2020

Before: Jay S. Bybee and Lawrence VanDyke, Circuit
Judges, and Vince Chhabria,[*] District Judge.

Opinion by Judge Bybee;
Concurrence by Judge Chhabria

---

[*] The Honorable Vince Chhabria, United States District Judge for the Northern District of California, sitting by designation.

## SUMMARY[**]

### Criminal Law

The panel reversed the district court's denial of a motion to suppress inculpatory statements in a case in which the defendant entered a conditional guilty plea to aiming a laser at an aircraft in violation of 18 U.S.C. § 39A.

After someone at the defendant's address pointed a laser at a police aircraft in flight, officers went to the defendant's home, illegally detained him, interrogated him without *Miranda* warnings, and after the defendant confessed, seized the laser. Eight months later, an FBI agent approached the defendant outside his home and stated he was there to ask "follow-up" questions about the incident. The defendant again admitted to shining the laser at the plane. The defendant moved to suppress the inculpatory statements he made to the FBI agent because the illegality of the first encounter tainted the second. The government did not dispute that the initial encounter violated at least the Fourth Amendment.

The panel explained that when a confession results from certain types of Fourth Amendment violations, the government must go beyond proving that the confession was voluntary—it must also show a sufficient break in events to undermine the inference that the confession was caused by the Fourth Amendment violation. After considering together the relevant factors set forth in *Brown v. Illinois*, 422 U.S.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

590 (1975), the panel was persuaded that the second encounter, introduced as a "follow up" to the first, was directly linked to the original illegalities. The panel explained that although significant time had passed, and the record does not show that the officers' conduct was purposeful or flagrant, the eight-month time period was collapsed by the agent opening the conversation by stating that he was following up on the original investigation. Without other intervening circumstances that act to separate the incidents, the panel concluded that the government cannot carry its burden of proving that the defendant's statements were sufficiently attenuated from the illegal detention and seizure eight months prior.

Concurring, District Judge Chhabria wrote separately to emphasize that reversal is warranted only because of how this case was presented to the panel: instead of meaningfully analyzing the defendant's first encounter with law enforcement to help the panel determine what sort of violation occurred, the government joined the defendant in the view that because his rights were violated in the first encounter (and regardless of which particular rights were violated), the panel must conduct the attenuation analysis outlined in *Brown* to determine whether the confession must be excluded.

---

## COUNSEL

Conor Huseby (argued), Assistant Federal Public Defender, Portland, Oregon, for Defendant-Appellant.

Peter Davis Sax (argued), Assistant United States Attorney;
Kelly A. Zusman, Appellate Chief; Billy J. Williams, United
States Attorney; United States Attorney's Office, Portland,
Oregon; for Plaintiff-Appellee.

---

**OPINION**

BYBEE, Circuit Judge:

In the early morning hours of July 12, 2017, officers went
to the home of defendant-appellant Nikolay Bocharnikov
after someone at his address pointed a laser at a police aircraft
in flight. The officers illegally detained Bocharnikov,
interrogated him without *Miranda* warnings, and, after
Bocharnikov confessed, seized the laser. Eight months later,
an FBI agent approached Bocharnikov outside his home and
stated he was there to ask "follow-up questions" about the
incident. Bocharnikov again admitted to shining the laser at
the plane. When Bocharnikov was charged with violating
18 U.S.C. § 39A, he moved to suppress the inculpatory
statements he made to the FBI agent because the illegality of
the first encounter tainted the second. The district court
denied the motion. We reverse.

I

In July of 2017, a Portland police aircraft flying over
Gresham, Oregon, was struck by a green laser, temporarily
blinding the pilot. The plane's equipment was able to
determine the laser's source as Bocharnikov's residence.
Shortly after midnight, three uniformed officers from the
Multnomah County Sheriff's Department (MCSD) arrived at
Bocharnikov's home. Bocharnikov's wife answered the door

and said that only she and her husband were home and her husband was in the shower. A few minutes later, Bocharnikov, still wet from the shower and wearing only his boxer shorts, came to the door. When asked about the laser strike, Bocharnikov said that "[i]t was the kids."

An officer then handcuffed Bocharnikov, sat him on the front steps of his house, explained "the seriousness of the incident," and said that they "were there only to recover the laser in question." Bocharnikov then admitted to shining the laser at the plane, stating that he did not think it could reach that far. He apologized and had his wife retrieve the laser and hand it over to the officers. The officers took the laser, released Bocharnikov, and left. At no time was Bocharnikov told that he was under arrest, nor was he given *Miranda* warnings. He did not hear from the Sheriff's Department again.

About a month later, FBI Special Agent Adam Hoover was assigned to the case. Agent Hoover became concerned about the legality of the July questioning. Some eight months later, in March of 2018, he drove to Bocharnikov's house to interview him again. Agent Hoover parked across the street and waited for his partner to arrive. While waiting, Agent Hoover saw Bocharnikov come out of his house and walk to his van. Agent Hoover got out of his car, waved to get Bocharnikov's attention, and crossed the street. He introduced himself as a member of the FBI Joint Terrorism Task Force and showed Bocharnikov his credentials. Agent Hoover was dressed in plain clothes and his weapon and handcuffs were not visible.

Agent Hoover stayed on the sidewalk, about five to ten feet away from Bocharnikov, and asked if he "could ask some

follow-up questions regarding the laser strike from the previous summer." Almost immediately, Bocharnikov said that it "was a stupid thing to do" and "it was a mistake." Their conversation lasted between twenty and forty minutes, with Agent Hoover's partner arriving about five minutes in. Agent Hoover did not specifically mention the details of the July 2017 detention, interrogation, seizure, or confession. He also did not read Bocharnikov *Miranda* warnings.

Bocharnikov, however, referred to the July incident and explained that he initially denied shining the laser because, having grown up in Kyrgyzstan, he had an innate fear of the police. He said that, in his experience, it was not a good thing for the police to come to one's home. Nevertheless, the conversation between Bocharnikov and Agent Hoover was "friendly," "polite," and "relaxed," and Bocharnikov did not appear to hesitate to speak with Agent Hoover.

At the end of the interview, Bocharnikov asked what would happen next. Agent Hoover said that he would write a report and the U.S. Attorney's office would decide how to proceed. The men shook hands and Agent Hoover left.

Three weeks later, a grand jury indicted Bocharnikov on one count of aiming a laser at an aircraft in violation of 18 U.S.C. § 39A. Bocharnikov moved to suppress his statements to Agent Hoover, arguing that they were tainted by the illegality of the detention and interrogation the previous July. After an evidentiary hearing, the district court denied Bocharnikov's motion, holding that the March 2018 interview "was not a continuation of the July 2017 interrogation." In reaching this conclusion, the court highlighted Bocharnikov's willingness to speak with Agent Hoover, the different circumstances of the two events, and the time that elapsed

between the two interviews. Bocharnikov then pleaded guilty, reserving his right to appeal the denial of his motion to suppress. This appeal followed.[1]

## II

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. For more than a century the Supreme Court has held that evidence obtained through a violation of the Fourth Amendment should be excluded from trial. *Wong Sun v. United States*, 371 U.S. 471, 484–85 (1963); *Weeks v. United States*, 232 U.S. 383, 398 (1914). The exclusionary rule is not a remedy prescribed by the Constitution, but a prophylactic measure. It serves to enforce the underlying personal right to be free from unreasonable searches and seizures by deterring violations of the Fourth Amendment. *See Davis v. United States*, 564 U.S. 229, 236–37 (2011). The rule applies both to direct products of a Fourth Amendment violation and to indirect products of the illegal search if they "bear a sufficiently close relationship to the underlying illegality." *United States v. Ladum*, 141 F.3d 1328, 1336 (9th Cir. 1998).

Bocharnikov argues that his statements in March 2018 should be suppressed because they were tainted by the illegality of his detention and the seizure of the laser in July 2017. The government does not dispute that the initial

---

[1] We review the district court's denial of a motion to suppress de novo. *United States v. Norris*, 942 F.3d 902, 907 (9th Cir. 2019).

encounter violated at least the Fourth Amendment.[2] The only question before us, then, is whether the taint of the illegal seizure was sufficiently attenuated to render Bocharnikov's statements to Agent Hoover admissible.

The government bears the burden of proving that the taint of the prior illegality has been attenuated enough to allow the second interrogation into evidence. *United States v. Cella*, 568 F.2d 1266, 1285 (9th Cir. 1977). Because the government effectively concedes that the police detained Bocharnikov in his own home without probable cause, the government must prove that Bocharnikov's second statement was voluntary and that it was "sufficiently an act of free will to purge the primary taint." *Brown v. Illinois*, 422 U.S. 590, 602 (1975).[3] Put differently, when a confession results from certain types of Fourth Amendment violations (rather than a Fifth Amendment violation), the government must go beyond proving that the confession was voluntary—it must also "show a sufficient break in events to undermine the inference that the confession was caused by the Fourth Amendment violation." *Oregon v. Elstad*, 470 U.S. 298, 306 (1985); *see also Dickerson v. United States*, 530 U.S. 428, 441 (2000) ("[*Elstad*] recognizes the fact that unreasonable searches under the Fourth Amendment are different from unwarned interrogation under the Fifth Amendment"); *United States v. Shetler*, 665 F.3d 1150, 1159–60 & n.4 (9th Cir. 2011)

---

[2] The government does not argue that the MCSD officers had probable cause to arrest Bocharnikov despite the lack of a warrant.

[3] The nature of the constitutional violations in the first encounter was never decided. But here and before the district court, the government agreed that the attenuation analysis applied. Having no pushback on the nature of the violations in the first encounter, we analyze the problem as invited by the parties.

(explaining the difference between confessions resulting from Fourth Amendment violations and Fifth Amendment violations). This is a fact- and case-specific inquiry. *Brown*, 422 U.S. at 603. Three factors are relevant in our analysis of whether Bocharnikov's statements were "sufficiently attenuated from the underlying illegality to be admissible: (1) the temporal proximity of the search to the confession; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct." *Shetler*, 665 F.3d at 1159 (citations omitted).

At first blush, the first factor would appear to work strongly in the government's favor. Indeed, eight months is a considerable time for the memory of the violation to dissipate in Bocharnikov's mind. But one of the first things that Agent Hoover said to Bocharnikov was that he was there to "ask some follow-up questions." That phrase was innocent enough, identifying in conversational fashion why Agent Hoover wished to speak with Bocharnikov, but it also served to refer Bocharnikov back to his prior detention and confession. In our view, referring back to the initial illegality by using the "follow-up" phrasing made the second encounter a de facto extension of the first incident, the passage of time notwithstanding.

The government argues that the passage of eight months is sufficient *alone* to purge the taint of the initial encounter and points us to several cases in which shorter periods of time were found sufficient. But those cases rested their analysis on more than just the mere passage of time. For example, in *United States v. Ceccolini*, 435 U.S. 268, 279–80 (1978), the Supreme Court held that the taint of an initial Fourth Amendment violation was sufficiently attenuated after four months. Although the Court stated that the length of time

was material, *id*. at 275, the Court was more concerned with the fact that the Fourth Amendment violation had led to discovery of a live witness rather than evidence. "Witnesses are not like guns or documents which remain hidden from view until one turns over a sofa or opens a filing cabinet." *Id.* at 276. The witness was already known to police, was not a suspect, and her testimony "was an act of her own free will in no way coerced or even induced" by the Fourth Amendment violation. *Id*. at 279. Likewise, in *United States v. Conrad*, 673 F.3d 728, 733–34 (7th Cir. 2012), the Seventh Circuit found the taint of an illegal entry sufficiently attenuated after only two hours. But there were several significant intervening circumstances that led to the court's conclusion, including the defendant being read his *Miranda* rights (despite his not being in custody), a change in location, the defendant's signing two consent forms advising him of his right to refuse the search, and the fact that the defendant had the chance to speak with his father over the phone. *Id.* at 735; *see also United States v. Shi*, 525 F.3d 709, 727 (9th Cir. 2008) (noting "several significant intervening events" that occurred in the day between events in holding that the taint of an involuntary confession was attenuated).

The mere fact that time has passed is not the deciding factor in any case. We must consider all of the circumstances, including the fact that there were no other "intervening events" besides the passage of time. *Cf. Shetler*, 665 F.3d at 1159 (stating that "there is no reason to think that the passage of 36 hours would have weakened the causal connection between the illegal searches and Shetler's statements, particularly because the DEA agents may have confronted Shetler with illegally seized evidence during the interview in which he made those statements" and concluding that "[a]lthough Shetler received *Miranda* warnings on at

least three occasions after the illegal searches and before his confession in the DEA office, such warnings [were] insufficient to 'purge the taint of a temporally proximate prior illegal act'" (citation omitted)). No one from the Sheriff's Department contacted Bocharnikov after their one-time encounter at his house. Bocharnikov had cooperated with the officers and given them the laser, which is all they asked from him. After eight months, he had no reason to believe that there were further consequences. Unlike the cases cited by the government, there are no intervening circumstances here that separate the incidents besides the passage of time.

Significantly, Bocharnikov was not read his *Miranda* rights during either encounter. So, even though he was released from the high-stress interrogation by the MCSD officers, nothing happened to help him understand that he did not have to cooperate with Agent Hoover and reaffirm what he had already confessed. Agent Hoover's reference to "follow-up questions" made clear to Bocharnikov that Agent Hoover knew what he had already told the officers. The government points to nothing else in the intervening eight months that could serve to make Bocharnikov think he had anything to gain from walking back the statements he made during the illegal detention in July.[4]

As to the final factor, the record does not show that the conduct here was purposeful or flagrant. There is no

---

[4] It is irrelevant for our purposes whether *Miranda* warnings were *required* before the second encounter, which was, by all accounts, friendly, noncoercive, and noncustodial. The two encounters were, quite naturally, linked in Bocharnikov's mind. We note the absence of a *Miranda* warning because the issuing of a *Miranda* warning, though not required in a noncustodial situation, might have served to break the link between the two questionings. *See Elstad*, 470 U.S. at 314.

evidence of any subterfuge on the part of the officers or Agent Hoover. *See Missouri v. Siebert*, 542 U.S. 600, 609–10 (2004) (plurality opinion) (describing a deliberate strategy of withholding *Miranda* warning, obtaining a confession, and then issuing *Miranda* warnings and securing a second confession). The officers were understandably focused on securing the laser to prevent any further threats to aircraft. However, as the government concedes, "the facts fall short of the type of exigent circumstances needed to sustain a warrantless arrest in a home." This factor tilts slightly against suppression, but in light of the other factors, it is not dispositive.

As we consider these factors together, we are persuaded that the March 2018 encounter, introduced as a "follow up" to the first, was directly linked to the original illegalities. While significant time had passed, that time was collapsed by Agent Hoover opening the conversation by stating that he was following up on the original investigation. Without other intervening circumstances that act to separate the incidents, the government cannot carry its burden of proving that Bocharnikov's statements to Agent Hoover were sufficiently attenuated from the illegal detention and seizure eight months prior. His statements should have been suppressed.

### III

The district court's denial of Bocharnikov's motion to suppress is **REVERSED**.

CHHABRIA, District Judge, concurring:

I concur in the result reached by the majority. I write separately to emphasize that reversal is warranted only because of how this case was presented to us. At no point has the government meaningfully analyzed Bocharnikov's first encounter with law enforcement to help us determine what sort of violation occurred. Instead, the government joins Bocharnikov in the view that because Bocharnikov's rights were violated in the first encounter (and regardless of which particular rights were violated), we must conduct the three-factor "attenuation" analysis outlined in *Brown v. Illinois* to determine whether his confession during the second encounter must be excluded. *See* 422 U.S. 590, 603–04 (1975).

The nature of the initial violation actually matters a great deal: only some constitutional violations are capable of tainting subsequent confessions. If the only transgression by the police in the first encounter was a *Miranda* violation, there would be no need to conduct the attenuation analysis that the government has asked us to conduct—the only question would be whether Bocharnikov's second confession was voluntary (and it obviously was). *Oregon v. Elstad*, 470 U.S. 298, 318 (1985). Similarly, no attenuation analysis would be required if the police committed a Fourth Amendment violation by arresting Bocharnikov in his home without a warrant (but with probable cause). *New York v. Harris*, 495 U.S. 14, 21 (1990); *United States v. Crawford*, 372 F.3d 1048, 1056 (9th Cir. 2004) (en banc); *see also Payton v. New York*, 445 U.S. 573, 576 (1980). In contrast, if the police violated the Fourth Amendment by arresting Bocharnikov without probable cause, we would need to conduct the attenuation analysis. *Crawford*, 372 F.3d at 1056.

An attenuation analysis would also be required if Bocharnikov's initial confession were coerced. *Elstad*, 470 U.S. at 310.

In the district court, without much analysis, Bocharnikov described the officers' conduct in the first encounter as violating *Miranda*, the Fourth Amendment, and the Fifth Amendment. He took the position that any of these violations required an attenuation analysis. The government responded by agreeing that the three-part attenuation test applies, arguing simply that it should win under that test. Because the parties set up the case this way, the district court did not rule on what sort of violation occurred during the first incident.

In his appellate brief, Bocharnikov goes into more detail about the alleged violations during the first incident. He contends that the officers committed a *Miranda* violation by interrogating him without advising him of his rights, and he says the officers violated the Fourth Amendment because they lacked a warrant to enter Bocharnikov's home. He also asserts a Fourth Amendment violation based on a lack of probable cause to seize him, saying that "the officers lacked probable cause to believe that Mr. Bocharnikov—as opposed to any other individuals observed by the aircraft—had pointed the laser at the aircraft." And he says the officers violated the Fifth Amendment by coercing a confession out of him.

The government has not pushed back on any of these arguments. To the contrary, at different points in its appellate brief, the government variously seems to refer to the first incident as involving a *Miranda* violation, a "warrantless arrest," and an "arrest unsupported by probable cause." In one paragraph, the government even appears to assume for purposes of the appeal that Bocharnikov's confession during

the first encounter was a "coerced initial statement." And at oral argument, despite suggestions from the bench that the attenuation analysis would be unnecessary if the police had probable cause to arrest Bocharnikov and if his first confession was not coerced, the government declined to adopt that position. In short, the government has disavowed the argument that an attenuation analysis need not be conducted, and left us with little choice but to assume for purposes of this analysis that all four violations took place.

Had the government pressed Bocharnikov on the nature of the first constitutional violation—or itself taken care to identify the violations and the legal consequences that flow from each—I strongly suspect we would have been compelled to rule the other way. At least on this record (which admittedly is not fully developed as it relates to the first encounter), it seems to me that the only true violations were a *Miranda* violation and a Fourth Amendment violation based on the failure to secure a warrant before seizing Bocharnikov inside his home. It appears that the police had probable cause to arrest him, and his first confession does not appear to have been involuntary. Accordingly, even though we have been drawn into an attenuation analysis here, nobody should interpret this case as actually requiring an attenuation analysis on similar facts.

Regarding the attenuation analysis itself, that too is affected by the government's decision not to contest Bocharnikov's various arguments about how the police violated his rights in the initial encounter. The third factor we consider in deciding whether to exclude evidence as the fruit of prior unlawful police conduct is the flagrancy of that conduct. *Brown*, 422 U.S. at 603–04. It would be difficult to conclude that this factor cuts in favor of the government when

it does nothing to contest Bocharnikov's argument that the police arrested him at home without a warrant and without probable cause, interrogated him without giving him *Miranda* warnings, and coerced a confession out of him. Against that backdrop, I agree with the result reached by the majority on the question of attenuation.

To rule in the government's favor on this appeal would have required us to bend over backwards, doing the government's work for it. Federal prosecutors should not need that kind of help from the courts, nor should they expect to receive it.