# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
   *Plaintiff-Appellant*,

v.

STRAUGHN SAMUEL GORMAN,
   *Claimant-Appellee*,

and

$167,070.00 IN UNITED STATES
CURRENCY,
   *Defendant*.

Nos. 15-16600
15-17103

D.C. No.
3:13-cv-00324-
LRH-VPC

OPINION

Appeal from the United States District Court
for the District of Nevada
Larry R. Hicks, District Judge, Presiding

Argued and Submitted April 17, 2017
San Francisco, California

Filed June 12, 2017

Before: Stephen Reinhardt and Marsha S. Berzon, Circuit
Judges, and Ann D. Montgomery,* District Judge.

Opinion by Judge Reinhardt

SUMMARY**

**Fourth Amendment / Civil Forfeiture**

The panel affirmed the district court's order in a civil
forfeiture action granting claimant's motion to suppress
evidence seized pursuant to a traffic stop; affirmed the award
of attorneys' fees; and held that the search of claimant's
vehicle following coordinated traffic stops violated the
Constitution.

The panel held that the first stop of claimant's vehicle
was unreasonably prolonged in violation of the Fourth
Amendment; the dog sniff and search of claimant's vehicle
during the coordinated second vehicle stop followed directly
in an unbroken causal chain of events from that
constitutional violation; and consequently, the seized
currency from the second stop was the "fruit of the
poisonous tree" and was properly suppressed under the
exclusionary rule.

---

* The Honorable Ann D. Montgomery, United States District Judge
for the District of Minnesota, sitting by designation.

** This summary constitutes no part of the opinion of the court. It
has been prepared by court staff for the convenience of the reader.

The panel also held that none of the exceptions to the "fruit of the poisonous tree" doctrine – the "independent source" exception, the "inevitable discovery" exception, and the "attenuated basis" exception – applied to claimant's case.

**COUNSEL**

Greg Addington (argued), Assistant United States Attorney; Elizabeth O. White, Appellate Chief; United States Attorney's Office, Reno, Nevada; for Plaintiff-Appellant.

Vincent Savarese, III (argued), Gentile Cristalli Miller Armeni Savarese, Las Vegas, Nevada, for Claimant-Appellee.

Mahesha P. Subbaraman, Subbaraman PLLC, Minneapolis, Minnesota, for Amicus Curiae Americans for Forfeiture Reform.

**OPINION**

REINHARDT, Circuit Judge:

This case is about coordinated traffic stops and the Fourth Amendment.

In January 2013, a police officer stopped Straughn Gorman on Interstate-80 outside Wells, Nevada for a minor traffic infraction. The officer came to think that Gorman might be carrying drug money. Acting on this concern, he unsuccessfully attempted to summon a drug-sniffing dog and then prolonged Gorman's roadside detention, which lasted nearly half an hour, as he conducted a non-routine

records check. Unable to muster a justification for searching the vehicle, he questioned Gorman further and finally released him without a citation. Undeterred, the officer then developed the bright idea of contacting the sheriff's office in Elko, a city further along Gorman's route, to request that one of their officers stop Gorman a second time. The first officer conveyed his suspicions that Gorman was carrying drug money, described Gorman's vehicle and direction of travel, and reported that his traffic stop had provided no basis for a search. "You're going to need a dog," he said.

A second officer, who had a dog with him, then made a special trip to the highway to intercept Gorman's vehicle. The second officer saw Gorman and eventually believed he had found a traffic reason to pull him over. Following the second stop, the second officer performed a series of redundant record checks and conducted a dog sniff. The dog signaled the odor of drugs or drug-tainted currency. On the basis of the dog's alert, the second officer obtained a search warrant, searched the vehicle, and found $167,070 in cash in various interior compartments.

No criminal charges arising from this incident were ever brought against Gorman. Instead, the government attempted to appropriate the seized money through civil forfeiture. Civil forfeiture allows law enforcement officials to "seize . . . property without any predeprivation judicial process and to obtain forfeiture of the property even when the owner is personally innocent." *Leonard v. Texas*, 137 S. Ct. 847, 847 (2017) (Thomas, J., respecting denial of certiorari). Gorman contested the forfeiture by arguing that the coordinated stops violated the Fourth Amendment. He prevailed. The district court ordered that his money be returned and also awarded him attorneys' fees. The government appealed. We affirm the district court.

## BACKGROUND

### A.

On the morning of January 23, 2013, Gorman was driving a motorhome westbound on Interstate-80 near Wells, Nevada. In this area, I-80 is a four lane highway with two lanes on each side of the center divider. Gorman had been driving in the right lane. According to Gorman, he pulled briefly into the left lane in an attempt to pass a semi-truck, but was unable to complete the pass because of the truck's continued speed. He returned to the right lane shortly thereafter. At no point during this maneuver was Gorman speeding.

Trooper Monroe, a local patrol officer, observed Gorman's pass attempt from the side of the road and, deeming it a potential "left-lane violation,"[1] accelerated so as to approach the motorhome from behind. Monroe turned on his lights, caught Gorman's attention, and pulled him over. Gorman stopped the vehicle at the side of the highway.

Monroe approached the driver's side window and made contact with Gorman. He told him that he pulled him over because of a "left-lane violation." Gorman explained that the trucks in the right lane were driving slowly and that he intended to return to the right lane once he completed the pass. Monroe replied that if he was unable to pass the vehicles in the right hand lane, he should not have attempted to do so in the first place.

---

[1] According to Monroe, a "left-lane violation" occurs when traffic backs up behind a slow moving vehicle in the left lane.

Gorman promptly produced his license and registration. In response to Monroe's inquiries, he said that he was on his way to visit "his chick" in Sacramento, that he was moving to California, and that the motorhome belonged to his brother. Gorman also responded that he earned money by selling paddleboards at "Beach Activities of Maui" in Hawaii.

Monroe found this information suspicious because he found the term "chick" to be "unusual" given Gorman's age, because he thought that the statement about visiting California and the statement about moving there were inconsistent, and because Gorman curtly answered "yep" when asked whether he was going to work in California. Monroe was also suspicious because Gorman could not recall his girlfriend's address and had to refer to his GPS before reporting his precise destination. As for Gorman's description of his previous employment in Hawaii, Monroe thought that "the way he said it sounded rehearsed." Further, Monroe found it puzzling that someone who sells paddleboards could afford to drive cross-country in a motorhome, given the large vehicle's poor gas mileage. He also thought it suspicious that Gorman's stated destination was Northern California, a place known for cultivating marijuana.

Monroe returned to his patrol car. He contacted Nevada Highway Patrol ("NHP") Communications and requested a drug-detection dog, a driver's license warrant check, and a criminal history report on Gorman. According to Monroe, "the dog . . . would give [him] probable cause to apply for a search warrant" if the dog "alerted." An alert could indicate the presence either of drugs or of drug-tainted currency. (Currency retains the odor of certain drugs with which it has come into contact.)

Monroe soon received the results of the routine warrant and criminal history checks. They revealed that Gorman had no prior arrests and no outstanding warrants. NHP Communications also informed Monroe that a dog was not available in Wells. "Without a dog I'm not even going to get into this one," Monroe replied. In short, Monroe concluded that there was insufficient probable cause to obtain a search warrant.

Monroe then initiated a non-routine record check. He asked the El Paso Intelligence Center, a multi-jurisdictional bureau known as EPIC, to compare Gorman's home address with its database of information related to drug and weapons smuggling, money laundering, and human trafficking. EPIC returned a notification that there was a Drug Enforcement Agency "hit" on Gorman involving the transfer of $11,000 in 2006. EPIC also indicated that Gorman had entered or exited the United States four times, on one occasion flying from Madrid, Spain to John F. Kennedy Airport in New York. Monroe told the EPIC operator that he did not "have a dog on [him]" and that he was "going to try to gain consent" and would "call and let [EPIC] know" whether he succeeded in gaining Gorman's consent to search the vehicle. Monroe also asked EPIC to run a search on a different address associated with Gorman, which returned the same results.

Twenty minutes into the stop, Monroe returned to the side of the motorhome, gave back Gorman's documents, and said that he was not issuing a citation. Monroe did not, however, advise Gorman that he was free to go. Instead, Monroe prolonged the roadside detention even further by questioning Gorman more pointedly. He asked how he could afford to drive a motorhome across the country given the high price of gas, and he asked how much money

Gorman made from his paddleboard business.   Gorman responded, "I don't want to talk about how much I make." Monroe then asked directly if there was anything illegal in his car and if he was carrying cash.  Gorman replied that he was "just carrying $2,000."  Monroe "thought he was lying." Monroe then asked Gorman if he could search the vehicle. Gorman said no.  Monroe finally sent Gorman on his way, after nearly half an hour.[2]  As he returned to the patrol car, Monroe muttered aloud to himself, "He's carrying money."

## B.

Immediately after he released Gorman, Monroe contacted NHP Communications and stated that "there was a vehicle headed westbound that [he] strongly suspected was carrying money."  He specified, "you're going to need a dog" because "the only way to get in this vehicle would [be] with probable cause."  According to Monroe, he hoped the Elko County Sheriff's Office would dispatch an officer – and a dog – to intercept Gorman and find a way to search his vehicle.

The Highway Patrol dispatcher contacted the Elko County Sheriff's Office, which then contacted an officer, Deputy Fisher.  The dispatcher said that Monroe "stopped a motor home near Wells" and that a canine unit "might want to take a second look at the car."  The dispatcher provided Gorman's license plate number and the location of the initial

---

[2] The video recording of the stop lasted from 9:02am to 9:26am and was 24 minutes long.  The Detail Call for Service Report tracking the stop, however, shows "trooper [Monroe] releasing vehicle from a stop" at 9:28am; "will be released in a few minutes" at 9:29am; and "nhp just released vehicle" at 9:34am.  The record is not clear as to whether Gorman was released at these slightly later times.  Monroe did not write a report on the traffic stop.

stop, and noted that Gorman had refused to consent to a search of the vehicle.

Following his conversation with the dispatcher, Fisher telephoned Monroe directly and spoke with him for about five minutes. Monroe advised Fisher of the "particulars of the stop" and described his "suspicions." He told Fisher that he thought there was cash in the vehicle but that he had to "let the guy go" because "he didn't think he had much more to go on … based on his information."

## C.

Fisher was not patrolling the roads when dispatch contacted him. After speaking with Monroe, however, he "proceeded out to the highway" in a patrol car to find the motorhome. He brought along a drug-sniffing dog, which was trained to alert to the odor of tainted currency as well as to the odor of drugs themselves. Fisher soon spotted a motorhome with a small curtain obscuring part of the driver's side window, began following the motorhome, and conclusively established that it was the same vehicle when he came close enough to view the license plate.

While trailing the vehicle, Fisher noticed additional problematic traffic violations: the motorhome's tire partly crossed onto the fog line three times. Fisher activated his lights, turned on the siren, and initiated a stop.

Fisher first approached the driver's side of the vehicle, spoke to Gorman, and requested his drivers' license and registration. After receiving the documents, Fisher contacted Elko central dispatch to initiate a routine records check for outstanding warrants and criminal history – exactly the same check that Monroe had performed.

Dispatch did not immediately respond to Fisher's request. Apparently, the dispatch office was delayed in replying to Fisher's request because of a concurrent medical emergency that temporarily consumed the office's resources. Fisher asked Deputy Prall, an officer dispatched to the scene to assist him, to initiate the records check again to see if "he could get through." Fisher asked Prall to "stick around" because he "didn't know where the traffic stop was going to lead."

Still awaiting the results of the records check, Fisher approached the motorhome to speak with Gorman again. He told Gorman that he was being detained "until the records check was done." Fisher asked if he was opposed to a canine assessment, and Gorman replied that he was, "if that means anything."

Fisher nevertheless prepared to begin the dog sniff. He first asked Gorman to step out of the vehicle and patted him down to ensure that he was not armed. He then returned to the patrol car and released the dog, which walked to the side of the road and began urinating. While it was doing so, Fisher initiated another redundant records check – this time, the same non-routine EPIC check that Monroe had performed. The results of that search were, of course, identical to those Monroe received at the time of the first stop.

Fisher finally brought the dog forward to begin its sniff. The dog alerted to the right rear fender and rear cargo area. This alert gave Fisher probable cause to obtain a search warrant. He then made a telephone call to apply for a warrant from the Elko County Justice Court. Fisher explained the positive alert to Gorman and informed him that the motorhome was being detained pending the warrant application. He said that while the motorhome was being

held, Gorman would be free to leave once his records check returned without problems.

The records check finally came back and – again – revealed that Gorman had no arrests and no warrants. The officers offered to give Gorman "a ride to a coffee shop or somewhere in town where he could stay warm" while they waited for the warrant application to be processed. Gorman declined the offer, choosing to stay with the motorhome.

The Elko County court granted Fisher's application for a search warrant roughly twenty minutes later. Fisher took the motorhome to a sheriff's station where he searched it and found currency in white envelopes and bundles, "each bound with rubber bands and sealed inside plastic vacuum-sealed bags." He also discovered fifteen pages of papers and notes with entries that resembled "pay/owe" sheets, an inhaler, directions to Garberville, California, and "two large empty canvas duffle-type bags and a large empty hard-sided storage 'Pelican' case." Fisher discovered and seized a total of $167,070 in cash.

### D.

No criminal charges were brought against Gorman arising from this incident. Instead, the federal government pursued civil forfeiture of the $167,070.[3] In the forfeiture action, Gorman filed a motion to suppress the currency on the ground that it was obtained in violation of the Fourth Amendment. The district court held an evidentiary hearing at which it "viewed the video of both traffic stops and heard

---

[3] The state turned over the money to the federal government, the party pursuing forfeiture here, under a revenue sharing program in which the state may keep as much as 80% of the forfeited sum.

deposition testimony from the officer who effectuated the first stop, and live testimony from the officer who effectuated the second stop." In light of that evidence, the court considered Gorman's arguments that the seized currency represented the "fruit of the poisonous tree" and that his roadside detentions were unreasonably prolonged, and ruled in Gorman's favor. The court held that "the two traffic stops [were] inextricably connected and that Gorman's total detention was unreasonably prolonged" in violation of the Fourth Amendment, and granted the motion to suppress. In a separate order, the court awarded Gorman $146,938.50 in attorneys' fees.

The government appealed both the order granting the motion to suppress and the order awarding attorneys' fees. The two appeals are consolidated here.[4]

## STANDARD OF REVIEW

"We review *de novo* the district court's ruling on a motion to suppress and for clear error the district court's underlying findings of fact." *United States v. Evans*, 786 F.3d 779, 784 (9th Cir. 2015).

## DISCUSSION

We hold that the search of Gorman's vehicle following the coordinated traffic stops violated the Constitution and affirm the district court's order granting Gorman's motion to

---

[4] Meanwhile, the court entered judgment in Gorman's favor, ordered the funds returned to him, stayed that order pending our consideration of the government's appeal, and stated that during appeal, the seized funds shall accrue interest from the date of seizure calculated pursuant to 28 U.S.C. § 2465(b)(1)(C)(i)–(ii) and post–judgment interest as set forth in 28 U.S.C. § 1961.

suppress. Gorman's first roadside detention was unreasonably prolonged in violation of the Fourth Amendment. The dog sniff and the search of Gorman's vehicle, in turn, followed directly in an unbroken causal chain of events from that constitutional violation. As a result, the seized currency is the "fruit of the poisonous tree" and was properly suppressed under the exclusionary rule. *See Wong Sun v. United States*, 371 U.S. 471, 487–88 (1963).

## A.

### 1.

Traffic stops are "presumptively temporary and brief." *Berkemer v. McCarty*, 468 U.S. 420, 437 (1984). In fact, "[t]he vast majority of roadside detentions last only a few minutes." *Id*. When a motorist "sees a policeman's lights flashing behind him," he expects "that he will be obliged to spend a short period of time answering questions and waiting while the officer checks his license and registration, that he may then be given a citation, but that in the end he most likely will be allowed to continue on his way." *Id.*; *see also Illinois v. Caballes*, 543 U.S. 405, 406, 410 (2005) ("less than 10 minutes" was acceptable).

The Supreme Court has made clear that traffic stops can last only as long as is reasonably necessary to carry out the "mission" of the stop, unless police have an independent reason to detain the motorist longer. The "mission" of a stop includes "determining whether to issue a traffic ticket" and "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Rodriguez v. United States*, 135 S. Ct. 1609, 1615 (2015). A

stop that is unreasonably prolonged beyond the time needed to perform these tasks ordinarily violates the Constitution.

This is so because the "[t]emporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of [the Fourth Amendment]." *Whren v. United States*, 517 U.S. 806, 809–10 (1996). The observation of a traffic infraction provides "[a]uthority for the seizure" of the driver only until the "tasks tied to the traffic infraction are – or reasonably should have been – completed." *Rodriguez*, 135 S. Ct. at 1614 (citing *United States v. Sharpe*, 470 U.S. 675, 686 (1985)). Thus, "[a] seizure justified only by a police-observed traffic violation . . . become[s] unlawful if it is prolonged beyond the time reasonably required to complete" the stop's mission. *Id*. at 1611 (internal quotation marks omitted) (quoting *Caballes*, 543 U.S. at 407).

The Supreme Court has indicated that *within* "the time reasonably required to complete" the stop's mission, the Fourth Amendment may tolerate investigations that are unrelated to the purpose of the stop and that fall outside the scope of that mission. *Id*. at 1615. The Court is clear, however, that these "unrelated investigations" are impermissible if they "lengthen the roadside detention." *Id*. at 1614. Police simply may not perform unrelated investigations that prolong a stop unless they have "independent reasonable suspicion justifying [the] prolongation." *Evans*, 786 F.3d at 787 (citing *Rodriguez*, 135 S. Ct. at 1612).

Non-routine record checks and dog sniffs are paradigm examples of "unrelated investigations" that may not be performed if they prolong a roadside detention absent independent reasonable suspicion. These inquiries "[l]ack[]

the same close connection to roadway safety as the ordinary inquiries." *Rodriguez*, 135 S. Ct. at 1615. We have held that prolonging a traffic stop to perform an ex-felon registration check or a dog sniff is unlawful because these tasks are "aimed at detecting evidence of ordinary criminal wrongdoing" and are not "ordinary inquir[ies] incident to the traffic stop." *Evans*, 786 F.3d at 788 (original brackets omitted) (quoting *Rodriguez*, 135 S. Ct. at 1615). "[T]he Government's endeavor to detect crime in general or drug trafficking in particular . . . cannot justify prolonging an ordinary traffic stop . . . ." *Id*. (internal quotation marks omitted) (quoting *Rodriguez*, 135 S. Ct. at 1616). "Such on-scene investigation into other crimes detours from an officer's traffic mission." *Id*. (internal quotation marks and alterations omitted) (quoting *Rodriguez*, 135 S. Ct. at 1616).

**2.**

The government concedes that Gorman's roadside detention following his first stop – the stop initiated by Monroe on the basis of the left-lane violation – was unreasonably prolonged in violation of the Fourth Amendment. The stop should have taken only a short time – enough time to warn Gorman about left lane rules, determine whether to issue a traffic citation, and perform routine checks on his driver's license and registration. Instead, Monroe detained Gorman for a total of nearly half an hour, not an insignificant portion of which occurred after the routine checks returned a clean license and criminal history report. During that additional period, Monroe performed non-routine investigative inquiries and questioned Gorman about matters unrelated to the traffic infraction. These actions and inquiries fell beyond the scope of the stop's "mission." They were, instead, impermissibly

"aimed at detect[ing] evidence of ordinary criminal wrongdoing." *Evans*, 786 F.3d at 788 (citation omitted).

Monroe claims to have found Gorman suspicious, but, as the government concedes, nothing he discovered in his initial questioning of Gorman provided independent reasonable suspicion for these "unrelated investigations" or provided probable cause for a search warrant. Detaining Gorman longer than it took to complete the stop's mission unquestionably violated the Constitution.

**B.**

Although Gorman's first roadside detention violated the Fourth Amendment, the currency that Gorman seeks to suppress was discovered pursuant to the second stop – the stop initiated by Fisher after his telephone call with Monroe. We must therefore consider the effect of the first, concededly unconstitutional, detention on the second stop. We conclude that the illegality of the first detention "tainted" the evidence obtained during the second stop.[5]

---

[5] Because we conclude that the seized currency is inadmissible as the "fruit of the poisonous tree," we do not consider the argument that the second stop, taken independently, was itself unconstitutional. It could well be argued, for example, that performing the routine records checks during the second stop (which in Gorman's case took significantly longer than usual because the central dispatch was delayed in responding to Fisher's inquiry) unreasonably prolonged Gorman's roadside detention because Fisher knew in advance what the results of those redundant checks would be, as he correctly assumed Monroe already had done them and knew Monroe had found no probable cause to search the vehicle. Fisher's checks therefore served no purpose other than to prolong the traffic stop.

**1.**

The exclusionary rule encompasses "evidence seized during an unlawful search," and also the "indirect . . . products of such invasions." *Wong Sun*, 371 U.S. at 484. Evidence derivative of a Fourth Amendment violation – the so-called "fruit of the poisonous tree," *id*. at 488 – is ordinarily "tainted" by the prior "illegality" and thus inadmissible, subject to a few recognized exceptions. *United States v. Washington*, 490 F.3d 765, 774 (9th Cir. 2007).

We addressed the "fruit of the poisonous tree" doctrine in *United States v. Johns*, 891 F.2d 243 (9th Cir. 1989). In *Johns*, officers suspected that illegal activity was taking place at a small airstrip near Tucson, Arizona. After receiving a tip, officers stopped a truck leaving the airstrip and searched it without a warrant. The government conceded that this stop was illegal. *Id.* at 244. "As a result of the stop," however, "the officers learned the identity" of the driver and passenger, and began to surveil them, which led to the discovery and seizure of marijuana. *Id*. We held that the marijuana evidence "must be suppressed because the illegally obtained identification significantly directed the investigation which led to the marijuana." *Id*. at 245.

We explained that evidence qualifies as the "fruit of the poisonous tree" when "the illegal activity tends to significantly direct the investigation to the evidence in question." *Id.* (quoting *United States v. Chamberlin,* 644 F.2d 1262, 1269 (9th Cir.1980)). "The focus," in other words, "is on the causal connection between the illegality and the evidence." *Id*. (citation omitted). Because "[t]he illegal stop was the impetus for the chain of events leading to the marijuana," the marijuana evidence was inadmissible. *Id*. at 245–46. We also noted in *Johns* that "the burden of

showing admissibility rests on the prosecution." *Id*. at 245 (quoting *Chamberlin*, 644 F.2d at 245).

Here, there is an indisputable "causal connection" between Gorman's concededly unlawful detention and the dog sniff and its fruits. *See id.* at 245. The detention unquestionably served as "the impetus for the chain of events leading to" the discovery of the currency. *See id.* It is clear, moreover, that Monroe's suspicions from the first stop "significantly direct[ed]" Fisher's actions in making the second stop and conducting the sniff and search. *See id.* The close connection between the constitutional violation (the first detention) and the seizure of the currency is apparent.

On the basis of suspicions that accrued during the course of Gorman's unlawful detention, Monroe alerted a separate law enforcement agency, informed Fisher of the basis for his suspicions, and requested that he attempt to stop Gorman for a second time, this time with a drug-sniffing dog. Fisher promptly estimated Gorman's location and made a special trip to the highway for the purpose of apprehending him and conducting the dog sniff – the sniff which led to the discovery of the currency. To repeat, there was a direct connection between the Fourth Amendment violation and its fruits. Thus, any evidence obtained from the sniff and search is inadmissible under the "fruit of the poisonous tree" doctrine.

The government does not contend that the "fruit of the poisonous tree" doctrine is applicable only if the impetus for the second stop came from the unlawful portion of Gorman's detention. Even if it did, however, our conclusion would be the same, because the facts here show clearly that part of the impetus for the second stop *did* come from the unlawful portion of Gorman's detention. It was only after the stop's mission had been completed that Monroe learned from the

EPIC report that there had been a "DEA hit" on Gorman involving the transfer of a large amount of money. Similarly, it was only after the stop's mission had been completed that Monroe questioned Gorman about his finances, and that Gorman refused to consent to a search of the motorhome, provoking Monroe to mutter to himself as he returned to his patrol car, "He's carrying money."[6] It was, moreover, following the end of Gorman's first detention, both the lawful and unlawful parts, that Monroe conveyed to Fisher the "particulars" of the stop, including information based on the unlawful part of the stop – for instance, that Gorman refused to consent to a search – and also conveyed his conclusion that, even after his "second lineup of questions" relating to drug interdiction, a dog sniff would be required to produce probable cause for a search. As a direct result, Fisher went out on the road with his dog to look for Gorman. Given that sequence, we need not determine whether it would be appropriate to divide an unlawful detention into lawful and unlawful parts for purposes of "fruit of the poisonous tree" analysis.[7]

---

[6] Monroe asked how he could afford to drive a motor home cross-country when gas prices were over $3.00 per gallon and inquired about his compensation in the paddleboard business. Gorman responded, "I don't want to talk about how much I make." Monroe then asked directly if there was currency in the vehicle, to which Gorman replied that he was carrying only $2,000. Finally, when Monroe asked "do you mind if we search the vehicle," Gorman responded, "I do mind, yes." Monroe spoke to Fisher shortly after this interaction and conveyed to him the "particulars" of the stop's full duration.

[7] We note, however, that had the government attempted to argue that only the legal portion of the initial detention provided the impetus for the second stop, it would need to make a clear showing to carry its burden in this respect, in light of the district court's finding that "Fisher never would have pulled Gorman over if Monroe had not relayed information

**2.**

None of the exceptions to the rule that evidence derived from an antecedent Fourth Amendment violation must be suppressed applies to Gorman's case. "[T]he Supreme Court has developed three exceptions to the 'fruit of the poisonous tree' doctrine which allow the admission of evidence derived from official misconduct" in some special circumstances. *United States v. Ramirez-Sandoval*, 872 F.2d 1392, 1396 (9th Cir. 1989). These exceptions are the "independent source" exception, the "inevitable discovery" exception, and the "attenuated basis" exception. *Id.*

"First, the independent source doctrine allows trial courts to admit evidence obtained in an unlawful search if officers independently acquired it from a separate, independent source." *Utah v. Strieff*, 136 S. Ct. 2056, 2061 (2016) (citing *Murray v. United States*, 487 U.S. 533, 537 (1988)). The currency here, however, was not separately discovered through an independent source. To the contrary, as explained above, it was discovered only because Fisher followed up on Monroe's request, which derived directly from Monroe's unlawfully prolonged stop.

"Second, the inevitable discovery doctrine allows for the admission of evidence that would have been discovered even without the unconstitutional source." *Id.* (citing *Nix v. Williams*, 467 U.S. 431, 443–444 (1984)). Here, there is no evidence whatsoever to suggest that the currency would have

---

about the first stop, a description of the white motor home, Monroe's suspicion that the vehicle contained large amounts of currency, and that a canine sniff would likely be required in order to obtain probable cause for a search." *See Johns*, 891 F.2d at 245. Often, the factors contained in the two portions of the detention may, in fact or in law, be inextricably linked.

been discovered in the absence of the unconstitutional conduct involved.

Finally, under the "attenuation doctrine," evidence is admissible when "the connection between the illegality and the challenged evidence" has become so attenuated "as to dissipate the taint caused by the illegality." *Ramirez-Sandoval*, 872 F.2d at 1396; *see also Strieff*, 136 S. Ct. at 2061. In evaluating whether the connection between an antecedent Fourth Amendment violation and subsequently discovered evidence is sufficiently attenuated to "purge" the "taint," we consider "the temporal proximity" of the illegal conduct and the evidence in question, "the presence of intervening circumstances," and "the purpose and flagrancy of the official misconduct." *Brown v. Illinois*, 422 U.S. 590, 603–04 (1975).

Here, nothing attenuated the connection between Gorman's unlawful detention and the seized currency. Gorman's first detention and the sniff and search of his vehicle were separated by less than an hour. That short period represented only the time necessary for Fisher to receive Monroe's information and proceed to the highway to intercept Gorman. Similarly, there were no intervening circumstances that might purge the taint. The only "intervening" event of any possible significance was Fisher's stop of Gorman for a traffic code violation. This stop, however – even assuming it was predicated upon a legitimate, if trivial, traffic infraction – was a direct result of Gorman's prior unlawful detention. Moreover, the investigation that followed the second stop, in which Fisher conducted a dog sniff and search rather than simply issuing a warning or citation, was entirely a product of Monroe's report – a product that was directly and deliberately planned and intended. The second stop was thus not an intervening

circumstance; rather, it was itself a direct result of Gorman's earlier unlawful detention.

In this regard, we agree with the reasoning and holding of the Second Circuit in *United States v. Foreste*, 780 F.3d 518 (2d Cir. 2015). In *Foreste*, the Second Circuit stated that it "misses the point" to think that a second traffic infraction and stop automatically legitimate a subsequent search when that search was conducted pursuant to information obtained during a prior stop. *Id.* at 525–26. It explained:

> Ordinarily, of course, stops for separate traffic infractions are unrelated, and any extensions of those stops for investigation are unrelated as well. But looking only to whether independent traffic violations support successive traffic stops would create a rule subject to . . . gamesmanship. . . . One officer could stop a vehicle for a traffic infraction on a common drug corridor, become suspicious of the driver's nervousness or explanation for his trip, and then detain the vehicle while a drug-sniffing dog is called to the scene. If the dog took too long to arrive (or, upon arriving, failed to detect any drugs), the officer could telephone a second officer down the road and apprise him of the situation. The second officer could then follow the vehicle until spotting a second traffic infraction, stop the vehicle, and, based on the suspicions relayed by the first officer, detain the vehicle a second time to again wait for a dog.

*Id.*

Here, the officers' impermissible gamesmanship is precisely what the Constitution proscribes. Under these circumstances, the purpose and flagrancy of the misconduct is irrelevant, although we note that here it was at the least purposeful.

In sum, because the currency seized from Gorman's vehicle was the fruit of the prior violation of Gorman's Fourth Amendment rights, the currency is inadmissible. The district court properly granted the motion to suppress.

## III.

The coordinated action at issue in Gorman's case offers a prime illustration of the value of the "fruit of the poisonous tree" analysis. The analysis allows us to see the officers' conduct in Gorman's case as what it is: a single integrated effort by police to circumvent the Constitution by making two coordinated stops. When the result of one stop is communicated and, on that basis, another stop is planned and implemented, the coordinated stops become, in effect, one integrated stop that must as a whole satisfy the Constitution's requirements. An illegal police venture cannot be made legal simply by dividing it into two coordinated stops. *See, e.g.*, *United States v. Peters*, 10 F.3d 1517, 1522–23 (10th Cir. 1993); *United States v. Ilazi*, 730 F.2d 1120, 1125 (8th Cir. 1984); *United States v. Morin*, 665 F.2d 765, 768–69 (5th Cir. 1982), *abrogated on other grounds by United States v. Bengivenga*, 845 F.2d 593, 596 (5th Cir. 1988) (en banc). The Constitution guards against this kind of gamesmanship because the Fourth Amendment's protections extend beyond the margins of one particular police stop and can extend to the integrated and purposeful conduct of the state.

## CONCLUSION

For the reasons set forth above, the district court's order granting Gorman's motion to suppress is **AFFIRMED.** The parties agree that if the district court's order granting the motion to suppress is affirmed, its award of attorneys' fees should also be affirmed. As a result, the award of attorneys' fees is also **AFFIRMED**.