**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

JAVIER GARCIA,
*Defendant-Appellant.*

No. 19-10073

D.C. No.
5:15-cr-00288-BLF-1

OPINION

Appeal from the United States District Court
for the Northern District of California
Beth Labson Freeman, District Judge, Presiding

Argued and Submitted March 2, 2020
San Francisco, California

Filed September 10, 2020

Before: Eugene E. Siler,[*] Kim McLane Wardlaw, and
Milan D. Smith, Jr., Circuit Judges.

Opinion by Judge Wardlaw

---

[*] The Honorable Eugene E. Siler, United States Circuit Judge for the
U.S. Court of Appeals for the Sixth Circuit, sitting by designation.

## SUMMARY[**]

### Criminal Law

The panel vacated a conviction and sentence for possession with intent to distribute methamphetamine, and remanded with instructions to suppress evidence found in the defendant's home and on his person, as well as statements he made at the police station following his arrest.

In a prior appeal, this court held that officers violated the Fourth Amendment when they entered the defendant's home without a warrant, ostensibly to determine whether someone inside posed a threat to their safety or required emergency assistance. Though the officers knew nothing about the defendant before entering his home, they discovered him inside, detained him at gunpoint, took him outside in handcuffs, and ran a records check that revealed he was subject to a supervised release condition authorizing suspicionless searches of his residence. After discovering this condition, the same officers who had conducted the initial unlawful entry reentered the home to conduct a full search, during which they found methamphetamine and other incriminating evidence.

The panel considered whether, under the attenuation doctrine, the discovery of the suspicionless search condition was an intervening circumstance that broke the causal chain between the initial unlawful entry and the discovery of the evidence supporting the conviction. The Government

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

conceded that the first factor, the temporal proximity between the unconstitutional conduct and the discovery of evidence, weighs in favor of suppression. As to the second factor, intervening circumstances, the panel concluded that the officers' discretionary decision to conduct a full investigatory search of the defendants' home, combined with the lack of evidence for why the officers decided to avail themselves of the search condition, leads to the conclusion that the discovery of the defendant's suspicionless search condition was not a sufficient intervening circumstance. As to the third factor, the purpose and flagrancy of the violation, the panel found particularly significant that the officers entered the defendant's home without cause, detained him at gunpoint, and removed him from the premises in handcuffs; and concluded that whatever role the officers' subjective good faith should play in the attenuation analysis, it is not enough to outweigh the other two factors, which both favor suppression.

## COUNSEL

Jamie Lee Moore (argued), San Rafael, California, for Defendant-Appellant.

Briggs Matheson (argued), Assistant United States Attorney; Merry Jean Chan, Chief, Appellate Section; David L. Anderson, United States Attorney; United States Attorney's Office, San Francisco, California; for Plaintiff-Appellee.

## OPINION

WARDLAW, Circuit Judge:

Javier Garcia again appeals his conviction for possession with intent to distribute methamphetamine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C). In a prior appeal, we held that officers from the Salinas Police Department violated the Fourth Amendment when they entered Garcia's home without a warrant, ostensibly to determine whether someone inside posed a threat to their safety or required emergency assistance. *United States v. Garcia*, 749 F. App'x 516, 520 (9th Cir. 2018) (*Garcia I*). Though the officers knew nothing about Garcia before entering his home, they discovered him inside, detained him at gunpoint, took him outside in handcuffs, and ran a records check that revealed he was subject to a supervised release condition authorizing suspicionless searches of his residence. After discovering this condition, the same officers who had conducted the initial unlawful entry reentered the home to conduct a full search, during which they found methamphetamine and other incriminating evidence.

We must decide whether, under the attenuation doctrine, the discovery of the suspicionless search condition was an intervening circumstance that broke the causal chain between the initial unlawful entry and the discovery of the evidence supporting Garcia's conviction in this case and the revocation of supervised release in the underlying case.[1] We conclude that the evidence found in the search was not sufficiently attenuated from the constitutional violation. We

---

[1] This opinion addresses Garcia's appeal of his criminal conviction. We decide Garcia's appeal of the district court's judgment revoking his supervised release in a concurrently filed memorandum disposition.

therefore hold that the district court erred by denying Garcia's motion to suppress, and we reverse his conviction.

## I.

## A.

Officers Richard Lopez and Raul Rosales of the Salinas Police Department were on patrol when they saw a man, later identified as Alfonso Nevarez, run away from them holding his waistband. Nevarez ignored commands to stop and ran into an apartment on Fremont Street, where Defendant Javier Garcia resided. The officers surrounded the building; Officer Lopez stood guard over the front door while Officer Rosales guarded the back. Within five minutes, Officer Rosales informed Officer Lopez by radio that he had apprehended Nevarez in a nearby backyard (Nevarez had apparently exited through a window at the back of the apartment).

Even though Nevarez was now safely in custody, Officer Lopez and two sergeants who had joined him decided to enter the apartment without a warrant to check for injured persons and to conduct a "protective sweep." The three officers entered with guns drawn and encountered Garcia, who was coming out of the bathroom. Garcia told the officers that he had been asleep, and the officers observed creases on his face that were consistent with that account. But the officers nevertheless handcuffed Garcia—for reasons unexplained—and took him outside.

Once outside, the officers asked Garcia his name, which they then used to run a records check. The check revealed that Garcia was subject to a federal supervised release condition requiring him to "submit his person, residence, . . . or any property under his control to a search" by "any

federal, state or local law enforcement officer at any time with or without cause."[2]  Purporting to rely on this condition, Officer Lopez went back inside the apartment to conduct a full search and found a wallet and bags of methamphetamine under a sleeping pad on the floor in the living room.  Inside the wallet, Lopez found more methamphetamine and identification belonging to Garcia.

Officer Lopez placed Garcia under arrest and took him to the police station.  Upon being questioned, Garcia admitted that the methamphetamine in the wallet was his.

## B.

Garcia was charged with possession with intent to distribute methamphetamine.  He filed a motion to suppress the evidence found in the apartment and his incriminating statements, arguing that the officers' initial warrantless entry into his home violated the Fourth Amendment, and that the evidence was the fruit of that unlawful entry.

The district court denied this motion on the basis that the officers' first entry had been permissible under the "emergency aid" and "protective sweep" exceptions to the general Fourth Amendment rule that officers must secure a warrant from a neutral magistrate before entering to search a home. *See Brigham City v. Stuart*, 547 U.S. 398, 403 (2006) (emergency aid exception); *Maryland v. Buie*, 494 U.S. 325, 337 (1990) (protective sweep exception). It therefore did not consider whether the exclusionary rule should apply.

---

[2] The condition had been imposed following a prior federal conviction for conspiracy to distribute cocaine.

Garcia appealed, and a different three-judge panel of our court reversed. *Garcia I*, 749 F. App'x at 517. The panel concluded that the emergency aid exception did not apply because the officers "lacked an objectively reasonable basis to believe that there was someone inside of the residence in need of immediate assistance," particularly in light of the fact that the officers already knew that Nevarez was safely in custody before they conducted their warrantless entry. *Id.* at 518–19. Nor did the protective sweep exception apply, because the officers had no reason to believe that there was anyone remaining in the apartment, much less someone who posed a threat to their safety. *Id.* at 519–20.

Although the panel concluded that the initial warrantless entry into Garcia's home violated the Fourth Amendment, it remanded to the district court to determine in the first instance whether the exclusionary rule required suppression of the evidence discovered during, and as a result of, the second search. *Id.* at 520.

On remand, the district court denied the motion to suppress once again, reasoning that, under the attenuation doctrine, the officers' discovery of the suspicionless search condition was an intervening circumstance sufficient to break the causal link between the unlawful original entry and the discovery of the inculpatory evidence. It concluded that the facts here were "on all fours" with *Utah v. Strieff*, 136 S. Ct. 2056 (2016), in which the Supreme Court held that the discovery that a suspect had an outstanding arrest warrant

broke the chain of causation between an unlawful street stop and the discovery of evidence.[3]  Garcia again appeals.

## II.

We have jurisdiction under 28 U.S.C. § 1291.  We review the denial of the motion to suppress de novo.  *United States v. Ped*, 943 F.3d 427, 430 (9th Cir. 2019).

## III.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  The typical remedy for a Fourth Amendment violation is the exclusion of evidence discovered as a result of that violation from criminal proceedings against the defendant.  *Wong Sun v. United States*, 371 U.S. 471, 484–86 (1963).  This rule— the exclusionary rule—encompasses evidence directly "seized during an unlawful search" as well as "[e]vidence derivative of a Fourth Amendment violation—the so-called 'fruit of the poisonous tree.'"  *United States v. Gorman*, 859 F.3d 706, 716 (9th Cir. 2017) (quoting *Wong Sun*, 371 U.S. at 484, 488).

It is settled for purposes of this appeal that the officers violated the Fourth Amendment when they first entered Garcia's home without a warrant.  *Garcia I*, 749 F. App'x at 518–20.  Had the officers discovered the evidence at issue during this first search, there is no doubt that suppression would be required under the exclusionary rule.  And it is further undisputed that, but for that initial unconstitutional

---

[3] The district court rejected the Government's argument that the evidence was also admissible under the good faith exception.  The Government has not disputed that point on appeal.

entry, the officers would not have known that Garcia existed, much less that he was subject to the suspicionless search condition that the officers relied on to conduct the second search. Thus, the incriminating evidence would not have been discovered if not for the unconstitutional entry.

The question before us today is whether, despite these facts, suppression of the evidence found in Garcia's home, and other evidence derived from that evidence, is not required because, under the attenuation doctrine, the officers' discovery of the suspicionless search condition broke the causal chain between the Fourth Amendment violation and the discovery of the evidence.

**A.**

The attenuation doctrine is an exception to the usual rule of exclusion or suppression of the evidence. It applies when "'the connection between the illegality and the challenged evidence' has become so attenuated 'as to dissipate the taint caused by the illegality.'" *Gorman*, 859 F.3d at 718 (quoting *United States v. Ramirez-Sandoval*, 872 F.2d 1392, 1396 (9th Cir. 1989)); *see also Strieff*, 136 S. Ct. at 2061. In determining whether an intervening event has sufficiently purged the taint of a preceding Fourth Amendment violation, we consider three factors: (1) "the 'temporal proximity' between the unconstitutional conduct and the discovery of evidence," (2) "the presence of intervening circumstances," and (3) "the purpose and flagrancy of the official misconduct." *Strieff*, 136 S. Ct. at 2061–62 (quoting *Brown v. Illinois*, 422 U.S. 590, 603–04 (1975)). This is a fact-intensive inquiry that turns on the circumstances of a given case. *See Brown*, 422 U.S. at 603.

The Supreme Court most recently applied the attenuation doctrine in *Utah v. Strieff*, 136 S. Ct. 2056. Because the

district court concluded that *Strieff* directly governed the result here, we discuss it in some detail.

In *Strieff*, based on an anonymous tip of narcotics activity, an officer conducted surveillance of the suspected residence over the course of about a week, observing visitors who left only a few minutes after arriving. *Id.* at 2059. One day, he observed a man, Strieff, exit the home and walk toward a nearby convenience store. *Id.* at 2060. The state conceded that the officer lacked the requisite reasonable suspicion to lawfully detain Strieff. *Id.* But he nonetheless stopped Strieff in the parking lot, requested his identification, and ran a records check, which revealed that Strieff had an outstanding warrant for his arrest. *Id.* The officer placed Strieff under arrest and, during a search incident to that arrest, found drugs and drug paraphernalia in his pocket. *Id.*

Applying the attenuation doctrine factors, the Supreme Court acknowledged that the first factor—the temporal proximity between the unconstitutional stop and the discovery of the evidence—favored suppression. *Id.* at 2062. But it concluded that the other two factors counseled in favor of admitting the evidence.

The Court first ruled that the discovery of the arrest warrant was an intervening circumstance that "strongly favors the State." *Id.* This was not only because the warrant predated and was "entirely unconnected" with the unlawful stop, but also because of the unique nature of judicially issued warrants. As the Court explained, "[a] warrant is a judicial mandate to an officer to conduct a search or make an arrest, and the officer has a sworn duty to carry out its provisions." *Id.* (quoting *United States v. Leon*, 468 U.S. 897, 920 n.21 (1984)). Thus, the Court characterized the officer's arrest of Strieff as a mere "ministerial act that was

independently compelled by the pre-existing warrant." *Id.* at 2063. And it was this ministerial act that directly led to the lawful search incident to arrest that revealed inculpatory evidence.

The Court also concluded that the "purpose and flagrancy of the official misconduct" factor weighed against suppression because the officer was "at most negligent." *Id.* (quoting *Brown*, 422 U.S. at 604). The Court reasoned that because the officer lacked the reasonable suspicion necessary to conduct the stop, he should have simply asked whether Strieff would speak with him voluntarily, rather than demanding that he do so. *Id.* But this "error[] in judgment" did not favor suppression, the Court explained, because it did not "rise to a purposeful or flagrant violation of Strieff's Fourth Amendment rights." *Id.*

## B.

With *Strieff* in mind, we turn to the facts here. As the Government concedes, the temporal proximity factor weighs in favor of suppression because only a few minutes passed between the officers' unconstitutional entry into Garcia's home and those very same officers' reentry into his home to conduct the investigatory search. Thus, we must determine whether the other two factors—intervening circumstances and the purpose and flagrancy of the violation—are sufficient to outweigh the lack of temporal separation between the Fourth Amendment violation and the discovery of the incriminating evidence.

## 1.

Finding that intervening circumstances favored suppression, the district court concluded that there was "no difference" between the discovery of the arrest warrant in

*Strieff* and the discovery of the suspicionless search condition here. It is true that, as in *Strieff*, Garcia's suspicionless search condition predated and was entirely unconnected to the officers' unlawful entry into his home. *See id.* at 2062. But a suspicionless search condition differs from an arrest warrant in a significant respect. As the Court explained in *Strieff*, a warrant is a "judicial mandate" that an officer has a "sworn duty" to carry out, and therefore arrests pursuant to warrants are mere "ministerial act[s]" that are "compelled by the pre-existing warrant." *Id.* at 2062–63. The decision to arrest pursuant to a warrant is made by the judicial officer who issued the warrant, not the police officer at the scene, who is merely executing it. *Id.*

The same is not true for conditions of supervised release that allow for suspicionless searches. While the suspicionless search condition here granted the officers the legal authority to search Garcia's home without cause, it did not—unlike the warrant in *Strieff*—*require* them to exercise that authority. The officers' decision to avail themselves of the suspicionless search condition was volitional, not "ministerial." *See id.* at 2063. This distinction is important because we have held that the attenuation doctrine does not apply when an officer's decision to exercise his discretionary authority is "significantly direct[ed]" by information learned during an unlawful search. *Gorman*, 859 F.3d at 716 (quoting *United States v. Johns*, 891 F.2d 243, 245 (9th Cir. 1989)).

For example, in *Gorman*, our first post-*Strieff* attenuation doctrine decision, an officer impermissibly prolonged a traffic stop in an attempt to drum up probable cause that would allow him to search a vehicle that he suspected contained drug money. *Id.* at 709, 715; *see also Rodriguez v. United States*, 575 U.S. 348, 354 (2015)

(explaining that authority for a traffic stop "ends when tasks tied to the traffic infraction are—or reasonably should have been—completed"). When the officer failed in that effort, he let the driver, Gorman, go but then called another officer further down the highway, relayed his suspicions (which were the product of the impermissibly extended stop), and requested that the second officer pull the vehicle over and search it with a drug-sniffing dog. *Gorman*, 859 F.3d at 709–10. The second officer tailed Gorman until he observed a traffic violation. *Id.* at 712. He then pulled the vehicle over and approached it with the drug-sniffing dog. *Id.* The dog alerted to the vehicle, which the officer used as probable cause to conduct a search that discovered incriminating evidence. *Id.* at 712–13.

The question before us was whether the second traffic stop, which was formally predicated upon a different traffic violation committed by Gorman after the first, unlawful stop, was an intervening circumstance that purged the taint of the earlier Fourth Amendment violation. *Id.* at 718–19. We held that it was not. As we explained, the second stop, and in particular, the decision to conduct a dog sniff, was a "direct result" of what the first officer had learned during the unconstitutional seizure. *Id.* at 718. In those circumstances, we concluded that "nothing attenuated the connection between Gorman's unlawful detention and the seized [evidence]." *Id.*

We reached a similar conclusion in *Frimmel Management., LLC v. United States*, 897 F.3d 1045 (9th Cir. 2018). There, a local sheriff's department conducted an unlawful search that found records suggesting that a business was employing undocumented immigrants. *Id.* at 1049. The sheriff's department reported the results of the search to Immigration and Customs Enforcement (ICE), which issued

a subpoena requiring the business to produce employer verification forms and other records. *Id.* at 1049–50. Based on information turned over in response to the subpoena, ICE charged the business with violations of the Immigration and Nationality Act. *Id.* at 1050.

Opposing the business's motion to suppress evidence obtained through the ICE subpoena, the Government argued that the ICE investigation was too attenuated from the earlier illegal search conducted by the sheriff's department. *Id.* at 1053. We disagreed. We concluded that because information stemming from the unlawful search by the sheriff's department had sparked ICE's interest in investigating the business, and because "the identity evidence that resulted from the [sheriff's department] raid 'significantly directed' [ICE's] subsequent investigation," the evidence produced in response to the subpoena remained tainted by the initial unlawful search. *Id.* at 1054 (quoting *Johns*, 891 F.2d at 244).

*Gorman* and *Frimmel* provide the applicable framework here. Just as in *Gorman*, where the additional traffic violation gave the second officer cause to stop Gorman's car, and in *Frimmel*, where ICE's subpoena power allowed it to compel the business to produce records, Garcia's suspicionless search condition gave the officers *authority* to search his home without cause. But as *Gorman* and *Frimmel* make clear, when an officer's exercise of discretionary authority is "significantly directed" by information learned during an unlawful search, the mere existence of that authority is not an intervening cause that purges the taint of the earlier constitutional violation. *Id.*; *Gorman*, 859 F.3d at 716–17.

Thus, the key question this case presents is whether the officers' discretionary decision to conduct a full

investigatory search of Garcia's home was significantly directed by information they learned during their initial unlawful entry. And because the Government bears the burden of showing attenuation, *Brown*, 422 U.S. at 604, it was the responsibility of the Government to introduce evidence on this point. Yet the Government did not present *any* evidence regarding the officers' reasons for entering Garcia's home the second time, much less evidence sufficient to show that this decision had nothing to do with what they saw inside the home minutes earlier, during their unconstitutional search.

This dearth of evidence is significant, because the circumstances strongly suggest that it may have been something inside the home that piqued the officers' interest in investigating further. The district court credited Officer Lopez's testimony that the officers entered the home the first time solely to ensure that there was nobody inside who posed a threat or needed assistance. Yet it is undisputed that by the time of their second entry, only a few minutes later, the officers intended to search for incriminating evidence. Thus, something must have happened to change the officers' motives during the short interval between the two searches. And all that transpired in that time period was that the officers entered Garcia's home, encountered Garcia for the first time, and discovered that he was on supervised release and subject to a condition allowing for suspicionless searches. One obvious possibility is that something the officers saw during their initial entry raised their suspicions that criminal activity was afoot.

The Government asserts that the only information the officers learned from the first search was Garcia's identity. It argues that this discovery has no relevance to the attenuation analysis because a person's identity cannot be

suppressed.  But even assuming that principle would extend to the physical evidence the Government seeks to admit,[4] the Government has not pointed to anything in the record from which we could conclude that Garcia's identity was the *only* thing the officers learned from the first search.

The officers did not enter Garcia's home with blinders on.  And the record shows that in the few minutes between the two searches, the officers' motives for entering the home abruptly changed from non-investigatory to investigatory. Yet the Government offers nothing more than its say-so to explain this sudden shift.  That is not enough to avoid suppression.  *Cf. United States v. Bocharnikov*, 966 F.3d 1000, 1007 (9th Cir. 2020) (Chhabria, J., concurring) ("To rule in the government's favor on this appeal would have required us to bend over backwards, doing the government's work for it.  Federal prosecutors should not need that kind of help from the courts, nor should they expect to receive it."). In the absence of evidence showing that the officers' decision to conduct the second search was untainted by what they saw during the initial unlawful entry, we conclude that the Government has not met its burden of showing that the

---

[4] We have held that "the simple fact of who a defendant is cannot be excluded, regardless of the nature of the violation leading to his identity." *United States v. Del Toro Gudino*, 376 F.3d 997, 1001 (9th Cir. 2004). However, as we noted in *Frimmel*, though the defendant's identity itself cannot be suppressed, other evidence, including physical evidence, may be suppressed consistent with the requirements of the exclusionary rule. *Frimmel*, 897 F.3d at 1054 (citing *Del Toro Gudino*, 376 F.3d at 1001). Here, as in *Frimmel*, Garcia is not seeking to suppress his identity, but rather the physical evidence found in his home and on his person, as well as incriminating statements derivative of that evidence. *See id.* at 1054–55.

discovery of the suspicionless search condition was a sufficient intervening circumstance.

Perhaps recognizing the problems posed by the lack of evidence explaining the basis for the officers' sudden development of an investigatory motive, the Government took the position at oral argument that the attenuation doctrine would apply even if the officers' decision to take advantage of the supervised release condition was influenced by information they learned during their earlier unconstitutional entry. This position is contrary to established precedent, which makes clear that there is no attenuation when information learned through an unlawful search "tends to significantly direct the investigation to the evidence in question." *Gorman*, 859 F.3d at 716.

The Government's citation to *Segura v. United States*, 468 U.S. 796 (1984), provides no support for its attenuation argument. *Segura* involved the independent source doctrine, which is distinct from the attenuation doctrine and "allows trial courts to admit evidence obtained in an unlawful search if officers independently acquired it from a separate, independent source." *Strieff*, 136 S. Ct. at 2061; *see Segura*, 468 U.S. at 805. It does not apply where, as here, the evidence is not "separately discovered through an independent source" but is instead found *only* as a direct result of an earlier constitutional violation. *Gorman*, 859 F.3d at 718. That is presumably why the Government has never invoked the independent source doctrine as a basis for admission of the evidence in this case.

Although the Supreme Court discussed *Segura* in *Strieff*, it did so to emphasize the unique nature of a warrant as an intervening circumstance—the "independent source" in *Segura* was a warrant obtained with information entirely unconnected to a Fourth Amendment violation. *Strieff*,

136 S. Ct. at 2062 ("[T]he *Segura* Court suggested that the existence of a valid warrant favors finding that the connection between unlawful conduct and the discovery of evidence is 'sufficiently attenuated to dissipate the taint.'") (quoting *Segura*, 468 U.S. at 805). As we have explained, the suspicionless search condition here differs from the warrant in *Strieff* in that it did not require the officers to search Garcia's home but merely granted them discretionary authority to do so.

Finally, our conclusion that Garcia's suspicionless search condition was not a sufficient intervening circumstance is consistent with our cases holding that "officers must know about a . . . Fourth Amendment search waiver before they conduct a search in order for the waiver to serve as justification for the search." *United States v. Job*, 871 F.3d 852, 859 (9th Cir. 2017); *see also United States v. Caseres*, 533 F.3d 1064, 1076 (9th Cir. 2008). This rule reflects the significant discretion officers have in deciding whether to conduct a search pursuant to a suspicionless search condition. If they did not, there would be no reason to require knowledge of the search condition in advance, as we could assume the evidence would inevitably be discovered as soon as an officer learned of his authority to search without cause. *See Nix v. Williams*, 467 U.S. 431, 443–44 (1984) (describing the inevitable discovery doctrine). The existence of this discretion, especially combined with the lack of evidence for why the officers decided to avail themselves of the search condition, leads us to conclude that the discovery of Garcia's suspicionless search condition was not a sufficient intervening circumstance.

**2.**

We now address the third attenuation factor—the purpose and flagrancy of the violation. This factor is aimed at ensuring that evidence is excluded only "when the police misconduct is most in need of deterrence." *Strieff*, 136 S. Ct. at 2063.

In evaluating this factor, we find it particularly significant that the officers entered Garcia's home without cause, detained him at gunpoint, and removed him from the premises in handcuffs.[5] The home is "first among equals" for purpose of the Fourth Amendment, *Florida v. Jardines*, 569 U.S. 1, 6 (2013), and it is no trifling matter for police to storm a residence with guns drawn. Incursions of this nature can have tragic results. *See Hudson v. Michigan*, 547 U.S. 586, 594 (2006) ("[A]n unannounced entry may provoke violence in supposed self-defense by the surprised resident."); *McDonald v. United States*, 335 U.S. 451, 460–61 (1948) (Jackson, J., concurring).[6] The need for

---

[5] Garcia urges us to conclude that the officers committed two separate constitutional violations: (1) unlawfully entering his home and (2) arresting him inside his home without a warrant, or even probable cause. Though we ultimately need not decide this point, it is troubling that the officers removed Garcia from his home in handcuffs when they had ostensibly entered only to see if someone inside the residence needed assistance or posed a threat, and there is no evidence that Garcia fell into either category.

[6] Recent events have reminded us of the devastating consequences that can follow when armed officers take the residents of a home by surprise. *See* Darcy Costello & Tessa Duvall*, Minute by Minute: What Happened the Night Louisville Police Fatally Shot Breonna Taylor*, Louisville Courier J. (May 29, 2020), https://tinyurl.com/y3ytxuju.

deterrence here is therefore much higher than in *Strieff*, which involved a stop on a public street.[7]

Arguing that the third attenuation factor nevertheless weighs against suppression, the Government focuses on the district court's finding that the officers believed in good faith that their initial entry into the home was necessary for public safety reasons. But whatever role the officers' subjective good faith should play in the attenuation analysis,[8] it is not

---

[7] An individual's interest in being free from police intrusion is higher in the home than in a public place. *Compare Terry v. Ohio*, 392 U.S. 1, 27–29 (1968) (individual may be seized in public based on reasonable suspicion that he is engaged in criminal activity), *with Payton v. New York*, 445 U.S. 573, 589–90 (1980) (seizures in a home generally require not only probable cause but also a warrant issued by a neutral magistrate). Thus, all things equal, Fourth Amendment violations involving the home will generally be more flagrant than those involving searches and seizures conducted in public. That said, we do not adopt Garcia's argument that attenuation can never be found when the constitutional violation at issue is an unlawful incursion into a home. Because the attenuation analysis turns on the facts of each case, it does not lend itself to categorical rules of this nature. *See Brown*, 422 U.S. at 603.

[8] It is not settled whether it is appropriate to examine an officer's subjective intentions in evaluating the "purpose and flagrancy" of a Fourth Amendment violation. The word "purpose" suggests a subjective inquiry. But only rarely are Fourth Amendment questions governed by subjective standards, and the Supreme Court has made clear in the context of the related "good faith exception" that the inquiry must remain objective. *See Herring v. United States*, 555 U.S. 135, 145 (2009). Because the good faith exception and the third factor of the attenuation doctrine are similarly focused on ensuring that evidence is suppressed only when there is culpable police conduct to deter, it is not obvious why the analysis would be subjective in one context and objective in the other. *Cf. id.* at 142 (explaining that the good faith exception is "perhaps confusingly" named because it focuses on objective reasonableness); *see also* Orin. S. Kerr, *The Questionable Objectivity of Fourth Amendment*

enough to outweigh the other two factors, which both favor suppression of the evidence.

Our recent decision in *United States v. Bocharnikov* is instructive on this point.  *See Bocharnikov*, 966 F.3d at 1004–05.  There, officers who lacked probable cause to arrest a defendant handcuffed him when he came to the door of his home and questioned him about an incident in which someone from the house had pointed a laser beam at a plane flying overhead.  *Id.* at *1002.  Eight months later, an agent returned to the home and questioned the defendant again, this time with his consent.  *Id.*

Addressing how the attenuation doctrine applied to statements made during the second round of questioning, we noted that there was "no evidence of any subterfuge" by the officers and that they were "understandably focused on securing the laser to prevent any further threats to aircraft." *Id.* at 1005.  In other words, we accepted the Government's assertion that the officers acted in good faith.  But at the same time, we recognized that "the facts f[e]ll short of the type of exigent circumstances needed to sustain a warrantless arrest in a home."  *Id.*  Balancing these countervailing considerations, we concluded that the third attenuation factor tilted only "slightly" against suppression, and that it was not enough to counter the other two factors, which both weighed in favor of suppressing the evidence.  *Id.* at 1005–06.

---

*Law*, 99 Tex. L. Rev. (forthcoming) (manuscript at 14–16, 36) (recognizing ambiguity in the doctrine and arguing that the use of subjective standards is "particularly problematic" in the context of the exclusionary rule because of the difficulty of accurately determining an officer's mental state).

Balancing the three attenuation factors, we reach the same conclusion here. The Fourth Amendment violation in this case is at least as egregious as the violation in *Bocharnikov*. There, officers conducted a warrantless arrest on the doorstep when they knew that somebody inside the home had committed the crime of pointing a laser at an aircraft, whereas here, the officers physically entered Garcia's home with guns drawn even though they had *no* knowledge that there was anybody inside, much less someone who posed a threat or needed assistance. The temporal proximity factor also weighs much more strongly in favor of suppression than it did in *Borcharnikov*—there, eight months passed between the Fourth Amendment violation and the discovery of the evidence, whereas here, the two events were separated by only minutes. And, as we have explained, the Government has failed to show that the discovery of the suspicionless search condition was a sufficient intervening circumstance. *See Gorman*, 859 F.3d at 718. Examining the totality of the circumstances, we conclude that even accepting the district court's finding that the officers acted in good faith, this fact alone is not enough to justify admission of the evidence. *Bocharnikov*, 966 F.3d at 1005–06.

## IV.

We conclude that the attenuation doctrine does not apply in the circumstances here. The district court therefore erred in denying Garcia's motion to suppress. We vacate Garcia's conviction and sentence and remand the case with instructions to suppress the evidence found in Garcia's home

and on his person, as well as the statements he made at the police station following his arrest.[9]

**REVERSED.**

---

[9] Though Garcia made the statements at issue after he received *Miranda* warnings, the Government has not argued that the *Miranda* warnings alone are a sufficient intervening circumstance for purpose of attenuation. *See United States v. Shetler*, 665 F.3d 1150, 1159 (9th Cir. 2011) (holding that *Miranda* warnings "are insufficient to 'purge the taint of a temporally proximate prior illegal' act") (quoting *United States v. Washington*, 387 F.3d 1060, 1075 (9th Cir. 2004)).